PD-0016-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/5/2015 7:31:35 PM
Accepted 2/6/2015 3:36:11 PM
ABEL ACOSTA
CLERK

**No. PD-0016-15**

In the
Court of Criminal Appeals of Texas
At Austin

————————◆————————

**No. 01-12-00688-CR**

In the Court of Appeals
For the First District of Texas

————————◆————————

**No. 1348372**

In the 178th District Court
Of Harris County, Texas

————————◆————————

**RAUL RODRIGUEZ**
*Appellant*
v.
**THE STATE OF TEXAS**
*Appellee*

————————◆————————

State's Petition for Discretionary Review

————————◆————————

FILED IN
COURT OF CRIMINAL APPEALS

February 6, 2015

ABEL ACOSTA, CLERK

**DEVON ANDERSON**
District Attorney
Harris County, Texas

**KELLI JOHNSON**
**DONNA LOGAN**
Assistant District Attorneys
Harris County, Texas

**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
State Bar No. 24071454
morgan_clinton@dao.hctx.net

1201 Franklin, Suite 600
Houston, Texas 77002
Tel: (713) 755-5826
FAX: (713) 755-5809

*Counsel for the Appellant*

ORAL ARGUMENT REQUESTED

**Statement Regarding Oral Argument**

The background subject in this case will require this Court to interpret a complex interaction between Texas's self-defense and concealed-handgun-license laws. Also, the State's third point questions the Court of Appeals's novel holding that an appellee could be estopped from making a harm argument regarding jury-charge error. This holding has far-reaching implications, as jury charges frequently contain error and the deciding issue on appeal is the harm analysis. The State requests oral argument so that the parties can address any questions or concerns this Court might have after reading the parties' briefs.

## Identification of the Parties

Counsel for the State:

      District Attorney of Harris County —     **Devon Anderson**

      Assistant District Attorneys at trial —     **Kelli Johnson**
                                                            **Donna Logan**

      Assistant District Attorney on appeal —     **Clinton A. Morgan**
                                                            1201 Franklin St.
                                                            Houston, Texas 77002

Appellant:                                               **Raul Rodriguez**

Counsel for the Appellant at trial:       **Neal Davis & Bill Stradley**
                                                            515 Caroline St.
                                                            Houston, Texas 77002

Counsel for the Appellant on appeal:     **Neal Davis, Bill Stradley &**
                                                            **Jonathan Landers**
                                                              515 Caroline St.
                                                            Houston, Texas 77002

Trial Judge:

      Presiding judge —                             **David L. Mendoza**

# Table of Contents

**Page**

Statement Regarding Oral Argument ......................................................... i

Identification of the Parties ...................................................................... ii

Table of Contents ....................................................................................... iii

Index of Authorities .................................................................................... v

Statement of the Case ................................................................................ 1

Statement of Issues Presented .................................................................. 1

Statement of Procedural History ............................................................... 1

**Factual and Legal Background**

    I.    The appellant filmed his armed confrontation with his neighbor. ........ 2

    II.    The jury charge included an instruction based in part on a correct statute and in part on an inapplicable statute. ........................................................ 3

**First Ground for Review**

The Court of Appeals erred by holding that the appellant's objection — that there was no evidence to support the submission of a particular jury instruction — was sufficient to preserve the error that was found on appeal — that the instruction was misworded. ...................................................... 7

    I.    The appellant objected that the instruction was a "comment on the weight of the evidence" and that no evidence supported the charge............ 8

    II.    The Court of Appeals incorrectly held that the appellant's objection was sufficient to preserve for review the trial court's use of the wrong statute. ................................................................................................................ 9

**Second Ground for Review**

The Court of Appeals misapplied this Court's decision in *Reeves* by holding that confusion alone was sufficient to constitute "some harm," regardless of whether that confusion actually helped the appellant......................................... 12

**Third Ground for Review**

The Court of Appeals erred in refusing to consider the State's *Almanza* harm argument based on its belief that the State was estopped from making that argument...............................................................................................16

    I.    The State argued that the appellant's self-defense claim failed as a matter of law, thus he was not harmed by minor errors in the discussion-of-differences instruction............................................................... 16

    II.    The Court of Appeals erred to apply the doctrine of estoppel to an *Almanza* harm analysis because there is no burden of proof in a harm analysis and estoppel only has meaning if one party has a burden of proof or persuasion............................................................................. 18

Conclusion ....................................................................................... 21

Certificate of Compliance and Service.................................... 22

Appendix ........................................................................................... 23

  *Rodriguez v. State*, ___ S.W.3d ___, No. 01-12-00688-CR, 2014 WL 7206226 (Tex. App.—Houston [1st Dist.] Dec. 18, 2014).........................................23

# Index of Authorities

## Cases

*Andrews v. State*
  774 S.W.2d 809 (Tex. App.—
  Eastland 1989, pet. ref'd) ............................................................................... 10

James v. State
  418 S.W.2d 513 (Tex. Crim. App. 1967) ........................................................ 10

*Ovalle v. State*
  13 S.W.3d 774 (Tex. Crim. App. 2000) .......................................................... 19

*Reed v. State*
  14 S.W.3d 438 (Tex. App.—
  Houston [14th Dist.] 2000, pet. ref'd) ........................................................... 19

*Reeves v. State*
  420 S.W.3d 812 (Tex. Crim. App. 2013) ........................................................ 13

*Rodriguez v. State*
  __ S.W.3d __, No. 01-12-00688-CR, 2014 WL 7206226 (Tex. App.—
  Houston [1st Dist.], Dec. 18, 2014) ........................................................ passim

*Taylor v. State*
  769 S.W.2d 232 (Tex. Crim. App. 1989) ........................................................ 12

*Walters v. State*
  247 S.W.3d 204 (Tex. Crim. App. 2007) ........................................................ 10

*Warner v. State*
  245 S.W.3d 458 (Tex. Crim. App. 2008) ........................................................ 18

## Statutes

TEX. CODE CRIM. PROC. art. 36.14 .................................................................... 10

TEX. PENAL CODE § 46.02 ................................................................................... 3

TEX. PENAL CODE § 46.035 ................................................................................. 5

TEX. PENAL CODE § 46.15 ................................................................................... 4

TEX. PENAL CODE § 9.31 ............................................................................. 4, 5, 6

## Statement of the Case

The appellant was indicted for murder. (CR 2). The appellant pled not guilty. (3 RR 300). A jury found him guilty as charged. (CR 2376, 2393). The jury assessed punishment at forty years' confinement. (CR 2392, 2393). The trial court certified the appellant's right of appeal, and the appellant filed a timely notice of appeal. (CR 2395, 2398).

## Statement of Issues Presented

1. The Court of Appeals erred by holding that the appellant's objection — that there was no evidence to support the submission of a particular jury instruction — was sufficient to preserve the error that was found on appeal — that the instruction was misworded.

2. The Court of Appeals misapplied this Court's decision in *Reeves* by holding that confusion alone was sufficient to constitute "some harm," regardless of whether that confusion actually helped the appellant.

3. The Court of Appeals erred in refusing to consider the State's *Almanza* harm argument based on its belief that the State was estopped from making that argument.

## Statement of Procedural History

On direct appeal, the appellant raised twenty-two points of error, seven relating to the guilt phase of trial and fifteen related to the punishment phase. On December 18, 2014, the First Court of Appeals issued a published opinion

1

sustaining the appellant's first point of error, relating to the guilt-phase jury charge, and reversing the appellant's conviction. *Rodriguez v. State*, __ S.W.3d __, No. 01-12-00688-CR, 2014 WL 7206226 (Tex. App.—Houston [1st Dist.], Dec. 18, 2014).

## Factual and Legal Background

The appellant took his gun with him when he walked to his neighbor's house to make a noise complaint, and he wound up killing the neighbor. At trial, he claimed self-defense. The trial court instructed the jury on the right to self-defense, including several qualifications on that right. Parts of this instruction were based on an inapplicable statute. This petition regards the Court of Appeals's conclusion that this error requires reversal.

### I.    The appellant filmed his armed confrontation with his neighbor.

On May 1, 2010, Kelly and Mindy Danaher held a joint birthday party for Mindy and their daughter at their home in rural Harris County. (5 RR 220, 222). As the party stretched late into the night, the appellant called in noise complaints to the local constable's office. (4 RR 66). When the constable did not shut down the party, the appellant grabbed his pistol, an extra magazine, and a video camera and went to the Danahers' house. (State's Ex. 6). For fiteen minutes he stood in the road filming the party from a distance, then he used

2

his flashlight to get the partiers' attention. (*Ibid*.). The partiers came out to the road, but as soon as they got close to the appellant he pulled his gun and threatened to shoot them. (*Ibid*.) The partiers backed away for a while, but eventually an intoxicated partier got within a dozen feet of the appellant and laughed, at which point the appellant opened fire. (*Ibid*.; 5 RR 277; 6 RR 91-92). The appellant shot three of the partiers before they were able to subdue him; one, Kelly Danaher, died at the scene. (5 RR 280-87; 6 RR 91-95). At trial, the appellant presented no evidence but relied on a State's exhibit (the video he recorded) to prove his self-defense claim. He also relied on the State's evidence that he had been issued a concealed handgun license (CHL). (State's Ex. 4).

## II. The jury charge included an instruction based in part on a correct statute and in part on an inapplicable statute.

At the charge conference, the parties discussed an instruction based on Penal Code Section 9.31(b)'s qualification on self-defense that an actor's use of force is not justified "if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was carrying a weapon in violation of Section 46.02 [Unlawful Carrying Weapons]." TEX. PENAL CODE § 9.31(b)(5)(A); (*see* 9 RR 110-13; CR 2368). Section 46.02 prohibits, *inter alia*, carrying a handgun "if the person is

3

not on the person's own premises or premises under the person's control, or inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control." TEX. PENAL CODE § 46.02(a).

It is undisputed that the appellant sought a discussion of differences with Danaher, was carrying a handgun, and was on premises that were not his or under his control. The problem the court ran into in incorporating this qualification to the right of self-defense is that the appellant is a CHL holder. Penal Code Section 46.15 exempts several categories of individuals from Section 46.02, one of them being individuals who are "carrying a concealed handgun and a valid [CHL]." TEX. PENAL CODE § 46.15(b)(6). Thus, if the appellant were carrying a concealed handgun and his CHL when he went to discuss his differences with Kelly Danaher, he would not be in violation of Section 46.02 and the discussion-of-differences qualification would not apply to him. On the other hand, if his handgun was not concealed when he went to discuss his differences, or if he did not carry his CHL with him, his use of force could not be justified. Page 9 of the jury charge was an attempt to put this matter to the jury:

> You are further instructed, as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a defendant against another is not justified if the defendant sought an explanation from or discussion with the other person concerning the defendant's differences with the other person while the defendant was

4

failing to conceal the handgun that he was carrying as a concealed handgun license holder, in violation of the law.

A person commits an offense if, while the person was a holder of a license to carry a concealed handgun, the person intentionally failed to conceal the handgun.

A person commits an offense if, while the person was a holder of a license to carry a concealed handgun, the person carried a handgun and was intoxicated.

"Handgun" means any firearm that is designed, made, or adapted to be fired with one hand.

If you find from the evidence beyond a reasonable doubt that the defendant, Raul Rodriguez, did then and there on May 2nd, 2010, fail to conceal a handgun in violation of the law stated above, before seeking an explanation from or discussion with the other person concerning the defendant's differences with the other person, then you will find against the defendant on the issue of self-defense.

(CR 2368).

The first paragraph is an accurate statement of the law. The phrase "in violation of the law" at the end is redundant — had the appellant failed to conceal his handgun, he would have been in violation of the law — but otherwise the paragraph is accurate, as far it goes.

The second and third paragraphs, however, should not have been included in this portion of the charge. These paragraphs describe two different ways to violate Penal Code Section 46.035, Unlawful Carrying of Handgun by License Holder. *See* TEX. PENAL CODE § 46.035(a), (d). That offense has no

5

relevance to the discussion-of-differences qualification.[1] The first and fifth paragraphs reflect this fact, as they do not instruct the jury on how to apply the second and third paragraphs to the issue of self-defense.

The fourth paragraph is an accurate and relevant definition, but the fifth paragraph has a couple of errors. It asks whether the appellant failed to conceal his gun "*before* seeking an explanation from or discussion with" Danaher. However, the relevant question (which the first paragraph stated correctly) was whether he failed to conceal his gun "while" seeking an explanation or discussion. *See* TEX. PENAL CODE § 9.31(b)(5). The improper tense is relevant because the State presented evidence from one of the appellant's neighbors, Pete Fornols, that the appellant was walking around the neighborhood with two unconcealed handguns at 8:30 pm, four hours before the killing. (*See* 7 RR 182-89).

Also, the fifth paragraph asks whether the appellant "fail[ed] to conceal a handgun in violation of the law stated above" which seems to refer to the second and third paragraphs. However, incorporating those paragraphs in this way does not do much; incorporating the second paragraph only requires that the failure to conceal be intentional, and incorporating the third paragraph

---

[1] It *is* relevant to the duty to retreat, as Section 9.31(e) absolves a defendant of a duty to retreat only if, *inter alia*, he is "not engaged in criminal activity at the time the force is used." The duty-to-retreat instruction was given elsewhere in the charge.

6

does nothing at all, as it makes no reference to a law violation resulting from a failure to conceal.

On appeal, the parties and the Court of Appeals agreed that this portion of the charge was erroneous. *See Rodriguez*, 2014 WL 7206226 at *8-10. The State believes, however, that the Court of Appeals erred in its assessment of whether these errors required reversal. The Court of Appeals's errors fall into three categories: It erred in determining that the appellant's objection alerted the trial court to these errors; it erred in assessing the harm caused by these errors; and it erred in refusing to consider the State's argument that, because the appellant was not entitled to a self-defense instruction at all, the errors were harmless.

## First Ground for Review

**The Court of Appeals erred by holding that the appellant's objection — that there was no evidence to support the submission of a particular jury instruction — was sufficient to preserve the error that was found on appeal — that the instruction was misworded.**

The Court of Appeals held that the appellant's objection to the existence of this jury charge was sufficient to preserve the errors in the wording of the charge. The State does not believe that the appellant's objection alerted the trial court to the errors found by the appellate court, thus it was error to hold

7

that the appellant preserved his complaint and could gain reversal under *Almanza's* "some-harm" standard. If the Court of Appeals's published holding is left standing, it will encourage parties to sandbag trial courts by raising vague trial objections but precise appellate complaints.

I. **The appellant objected that the instruction was a "comment on the weight of the evidence" and that no evidence supported the charge.**

During the charge conference, defense counsel specified his complaints about the five-paragraph instruction that would become page 9 of the court's charge:

> I think this is improper comment on the weight of the evidence. Also, I don't think the evidence supports this charge in this case.
>
> Specifically, there's absolutely no … credible evidence that [the appellant] failed to conceal his firearm or that he was intoxicated.

(9 RR 110). Defense counsel then discussed what he perceived to be the evidence regarding whether the appellant's gun was concealed:

> [Pete Fornols] testified [that] at some point early in the evening. This is before the shooting ever occurred or [the appellant] ever went over next door. That [the appellant] had two handguns in plain view.…
>
> … [S]o that has no relevance as to the time of the shooting, if [the appellant] was legally carrying a firearm. In other words, at the time of self-defense when he shot the weapon, was he unlawfully displaying a firearm, that would negate that. And so that testimony doesn't really relate to that at all.

8

The only other testimony was, Marshall Stetson [one of the partiers] said something on direct examination about how Raul Rodriguez had a firearm and it was visible. And it was a little unclear what he said.

But [co-counsel] cross-examined him. And he clearly said … that what he meant was he saw the firearm when [the appellant] had actually drawn it on Kelly Danaher….

And so with that, I don't think there's evidence that supports the instruction. And I also think it's an improper comment on the weight of the evidence.

(9 RR 110-11).

The State replied that the Penal Code Section 9.31(b)(5)(A) exception "talks about carrying a weapon in violation of the law," and therefore, the jury charge should include laws that the evidence showed the appellant violated, specifically Penal Code Section 46.035. (9 RR 112). The State argued that there was evidence the appellant's handgun was not concealed when he went to discuss his differences with the partiers; the trial court agreed and overruled the appellant's objections. (9 RR 112-13).

II. **The Court of Appeals incorrectly held that the appellant's objection was sufficient to preserve for review the trial court's use of the wrong statute.**

On appeal, the State argued that the appellant's objection did not apprise the trial court of the errors raised in his brief. (State's Reply to the Appellant's Amended Brief at 9-12). Indeed the trial court was correct to overrule the appellant's trial objections because there *was* evidence that his

handgun was unconcealed and that he was intoxicated. (*See* 5 RR 187-88 (appellant told paramedics he was on multiple anti-depressants and painkillers); 6 RR 80-81 (witness: appellant's gun "not concealed" at beginning of confrontation)). To the extent that "comment on the weight of the evidence" is a standalone objection, it was too vague to have meaning. *See Andrews v. State*, 774 S.W.2d 809, 811 (Tex. App.—Eastland 1989, pet. ref'd) (citing *James v. State*, 418 S.W.2d 513 (Tex. Crim. App. 1967); *see also Walters v. State*, 247 S.W.3d 204, 212 (Tex. Crim. App. 2007) (noting multiple meanings of "comment on the weight of the evidence").

The Court of Appeals, however, interpreted the appellant's objection much differently. First, it said that the appellant's invocation of Fornols's testimony apprised the trial court of the incorrect tense in the fifth paragraph of the erroneous charge. *Rodriguez*, 2014 WL 7206226 at *11. On this matter, the Court of Appeals simply misread the record; the appellant's objection did not mention the erroneous tense at all. However, this misreading played no role in the Court of Appeals's judgment, as it held that the erroneous tense was, at worst, harmless. *Id*. at *10.

Regarding the other errors in the charge, however, the Court of Appeals made this holding: "Although [the appellant] did not parse the instruction and

detail each of the errors in it, we conclude that his objection was sufficient to preserve the error he complains of on appeal." *Id*. at 11.

But "pars[ing] the instruction and detail[ing] … the errors in it" is generally what is meant by "preserv[ing] the error." *See* TEX. CODE CRIM. PROC. art. 36.14 (defendant must "distinctly specif[y] each ground of objection"). The Court of Appeals cited to several cases for boilerplate language supporting the liberal interpretation of trial complaints, but it did not follow the language it cited. For instance, it quoted *Clark v. State*, 364 S.W.3d 333 (Tex. Crim. App. 2012) for the proposition that an "issue [is] preserved without having been explicitly stated if 'there have been statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be." *Rodriguez*, 2014 WL 7206226 at *11. But in this case, the record shows that the trial court and the State thought the appellant's objection was that there was no evidence to support a discussion-of-differences instruction. There is no hint in the record that the trial court or the State understood the appellant to be objecting to the errors that were found on appeal: an irrelevant phrase at the end of one paragraph, two paragraphs based on the wrong statute, and an incorrect tense in another paragraph.

The problems in the charge that were found on appeal were technical in nature; to be preserved, the appellant *needed* to "parse" and "detail" what was

11

wrong with the charge. *See Taylor v. State*, 769 S.W.2d 232, 234 (Tex. Crim. App. 1989) ("the adequacy of an objection must be judged on whether it isolates the portion of the charge which is alleged to be deficient and identifies the reason for its deficiency"). The appellant's appellate complaint was substantially different from his trial objection. Therefore, the Court of Appeals erred by holding his objection sufficient to preserve the errors that it found.

## Second Ground for Review

**The Court of Appeals misapplied this Court's decision in *Reeves* by holding that confusion alone was sufficient to constitute "some harm," regardless of whether that confusion actually helped the appellant.**

On appeal, the appellant argued that the errors in the discussion-of-differences instruction allowed the jury to reject his self-defense claim based solely on his being intoxicated while carrying a handgun. (Appellant's Amended Brief at 35). The State argued that the errors in the jury charge either were meaningless or they aided the appellant by increasing the State's burden of proof. (State's Reply to Appellant's Amended Brief at 15-17). The Court of Appeals claimed that both of these interpretations of the instruction were plausible, but held that it need not further analyze the matter because, regardless of which reading was more plausible, the instruction "was

12

confusing. This is enough to weigh in favor of finding some harm." *Rodriguez*, 2014 WL 7206226 at \*12.

The Court of Appeals attributed its holding — that "confusion" *per se* weighs in favor of finding harm — to this Court's recent opinion in *Reeves v. State*, 420 S.W.3d 812 (Tex. Crim. App. 2013). *See Rodriguez*, 2014 W 7206226 at \*12 ("*See Reeves*, 420 S.W.3d at 818 (function of charge is to 'prevent confusion')"). However, the Court of Appeals's use of *Reeves* as a basis for *not* conducting an actual harm analysis stands in sharp contrast to *Reeves* itself, which involved a detailed harm analysis. This Court should grant review of this case to prevent the Court of Appeals's holding from becoming an accepted view of *Reeves*.

In *Reeves*, a murder defendant raised the issue of self-defense and the trial court, over objection, erroneously instructed the jury on the law of provocation as a qualification on the right of self-defense. *Reeves*, 420 S.W.3d at 815. As part of its harm analysis, this Court noted that, while the provocation instruction was relatively clear and well-written, the remainder of the jury charge's instruction on self-defense was "a six-page impenetrable forest of legal 'argle-bargle'..." *Id*. at 817. This Court concluded that the result of the indecipherable language in the self-defense portion of the charge was to

13

bring attention to the erroneously-submitted provocation instruction. *Id*. at 819.

The Court of Appeals's interpretation of *Reeves* as holding that any confusion is harmful is incorrect. *Reeves* conducted a detailed and subtle analysis to show that the confusion in the charge brought attention to an erroneously-submitted portion of the charge, and it was that focus, not the underlying confusion, that contributed to the harm. Anytime there is error in a jury charge (and often when there is not) there will be confusion. The Court of Appeals did not use *Reeves* as an example of a harm analysis, but as a reason not to conduct a harm analysis.

There is a significant difference in the types of errors involved in *Reeves* and this case that makes the Court of Appeals's misuse of *Reeves* particularly egregious. *Reeves* dealt with an erroneously-submitted instruction that limited the defendant's right of self-defense. In such a case, there is no conceivable way the error could have benefited the defendant. This case, by contrast, dealt with a limitation on self-defense that was supported by the evidence, but which was improperly worded when it was submitted to the jury. The presence of a misworded charge is not necessarily harmful; if the miswording increased the State's burden of proof or discredited a theory of guilt, that would actually aid the defendant. Determining whether a miswording was

14

harmful requires analyzing how it fit into the overall jury charge and what it instructed the jury to do. The Court of Appeals refused to consider these matters.

The Court of Appeals's focus on "confusion," rather than actual harm, went so far that at one point it noted an error that objectively aided the appellant but then counted it as harmful because it was "confusing." In footnote 4, the Court of Appeals took note of the trial court's instruction regarding the duty to retreat, which was erroneous but was not brought up by either party. That instruction told the jury that a defendant does not have a duty to retreat if, *inter alia*, he is "not engaged in criminal activity at the time the deadly force is used"; the instruction followed this up by instructing the jury not to consider whether the appellant had a duty to retreat. (CR 2363). As the Court of Appeals noted, the plain inference to be drawn from those statements is that the appellant was not engaged in criminal activity. *Rodriguez*, 2014 WL 7205226 at *8 n.4. Instead of taking this inference to the next logical step — that if the jury was instructed in the duty-to-retreat paragraph that the appellant was not engaged in criminal activity, the jury could not have used the complained-of discussion-of-differences instruction to find against the appellant — the Court of Appeals described the duty-to-retreat instruction as "confusing" and moved on. *See ibid*.

15

The Court of Appeals used this Court's opinion in *Reeves* as a reason not to conduct a meaningful harm analysis. Confusion alone is not a basis for reversal if it does not harm the defendant, and *Reeves* did not hold that it is. Unless this Court grants review, however, this will become an accepted use of *Reeves*.

## Third Ground for Review

**The Court of Appeals erred in refusing to consider the State's *Almanza* harm argument based on its belief that the State was estopped from making that argument.**

The most jurisprudentially far-reaching part of the Court of Appeals's opinion is its holding that the doctrine of estoppel can prevent an appellee from raising harm arguments in response to claims of jury-charge error.

### I. The State argued that the appellant's self-defense claim failed as a matter of law, thus he was not harmed by minor errors in the discussion-of-differences instruction.

At trial, the State was content to fight the appellant's self-defense claims by arguing his actions were not reasonable. (*see* 10 RR 7-20, 52-86). On appeal, though, the State pointed out that, as a matter of law, the appellant's use of force was not justified. (State's Reply to the Appellant's Amended Brief at 17-21). As discussed earlier, the appellant sought a discussion of differences while carrying a handgun at a place that was not property he

16

owned or controlled, therefore the qualification on self-defense found in Penal Code Section 9.31(b)(5)(A) would apply to him; the only way to avoid the application of this qualification would be to show that, under Penal Code Section 46.15, he was exempt from the purview of Penal Code Section 46.02.

There is no evidence in this case that any of the Section 46.15 exceptions apply to the appellant. The appellant has acted all along as though the CHL exception found in Section 46.15(b)(6) applies to him, but that exception only applies to an individual who "is carrying a concealed handgun and a [CHL]." TEX. PENAL CODE § 46.16(b)(6). There was no evidence at trial that the appellant was carrying either.

Only one witness, Marshall Stetson, testified about whether the appellant's handgun was concealed, and he said the appellant drew his gun from an unconcealed holster. (6 RR 80-82). There was no evidence whatsoever as to whether the appellant carried his CHL. (See 5 RR 156-57 (defense counsel stating he did not know if the appellant had his wallet the night of the incident, and testifying officer stating he did not remember seeing the appellant's CHL)). Because the appellant failed to produce evidence showing he was not in violation of Penal Code Section 46.02 when he went to discuss his differences with Kelly Danaher, his use of force was not justified as a matter of law. *See* TEX. PENAL CODE § 9.31(b)(5)(A).

17

As part of its harm argument related to the jury-charge error, the State argued that the fact that the appellant's self-defense claim failed as a matter of law meant that any errors in the self-defense portion of the jury charge were harmless, because whatever instruction he got was more beneficial than what he was entitled to. That is, had the jury charge been correct, there would have been no self-defense instruction at all, and if this case were remanded for another trial on the same evidence and a correct charge the result would be a foregone conclusion. The Court of Appeals refused to consider this argument because it believed the State was estopped from making it. *Rodriguez*, 2014 WL 7206226 at *14.

**II.** **The Court of Appeals erred to apply the doctrine of estoppel to an *Almanza* harm analysis because there is no burden of proof in a harm analysis and estoppel only has meaning if one party has a burden of proof or persuasion.**

The Court of Appeals erred to apply the doctrine of estoppel to a jury-charge harm analysis. "[B]urdens of proof or persuasion have no place in a harm analysis conducted under *Almanza*." *Warner v. State*, 245 S.W.3d 458, 464 (Tex. Crim. App. 2008). While the parties may advance arguments to aid an appellate court's harm analysis, the actual analysis is something that the court is obliged to conduct based on the content of the record, regardless of

the arguments of the parties. *Ovalle v. State*, 13 S.W.3d 774, 787 (Tex. Crim. App. 2000).

Thus, application of the estoppel doctrine in this context is inappropriate. Even if the State did not make a harm argument, the Court of Appeals would still have to conduct a harm analysis. A harm analysis is supposed to assess the likelihood that an error affected the proceedings, but the legal positions the parties took at trial do not make an error more or less harmful. "Estopping" a party from making a particular harm argument only has meaning if that party has a burden to show that the error was harmless. The law is clear that there is no such burden.

The Court of Appeals cited no authority for the proposition that estoppel applied to an *Almanza* harm analysis. Its only authority for using estoppel was *Reed v. State*, 14 S.W.3d 438 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). In that case, the defense and the State made a joint pre-trial motion to have Reed psychologically evaluated, but the evaluation never occurred. *Reed*, 14 S.W.3d at 442. On appeal, the State argued that the trial court did not abuse its discretion in proceeding with Reed's trial because there was no evidence that would raise a "bona fide doubt" as to Reed's competency. *Ibid*. The Fourteenth Court held that the State was estopped from making that argument because it conflicted with the position the State took in its trial motion. *Ibid*.

*Reed* applied estoppel to an argument regarding whether the trial court erred. Even if estoppel was appropriate in that context,[2] that does not make it applicable to a harm argument; the question of whether there was error is wholly distinct from the question of whether the error was harmful. By holding that the State's harm argument was, essentially, unpreserved, the Court of Appeals has issued a published opinion that conflicts with this Court's repeated holdings that there is no burden of proof or persuasion in an *Almanza* harm analysis. This Court should review that significant holding.

---

[2] The State is not convinced that *Reed* was correct to use estoppel to prohibit an appellee from advancing an argument in defense of the trial court's judgment, but that matter is too complex to get into in this petition.

As a side note, it is worth contrasting the actions that led to estoppel in *Reed* and in this case. In *Reed*, the State filed a motion questioning the defendant's competence, and then on appeal asserted there was no evidence that the defendant was incompetent. In this case, the Court of Appeals pointed to the State's actions at trial that contested the appellant's claim of self-defense as a basis for holding that, on appeal, the State was estopped from pointing out that the appellant had no right of self-defense.

## Conclusion

The State asks this Court to grant review, reverse the Court of Appeals, and remand this case for consideration of the appellant's remaining points.

**DEVON ANDERSON**
District Attorney
Harris County, Texas


/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002-1923
(713) 755-5826
Texas Bar No. 24071454

**Certificate of Compliance and Service**

I certify that, according to Microsoft Word's word-counting function, the portion of this brief for which Rule of Appellate Procedure 9.4(i)(1) requires a word count contains 4,494 words.

I also certify that I have requested that efile.txcourts.gov electronically serve a copy of this brief to:

Neal Davis
ndavis@sdrfirm.com

Jonathan Landers
jlanderslaw@gmail.com

Lisa McMinn
State Prosecuting Attorney
information@spa.texas.gov

/s/ C.A. Morgan
**CLINTON A. MORGAN**
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas  77002-1923
(713) 755-5826
Texas Bar No. 24071454

Date:  February 5, 2014

22

**Appendix**

*Rodriguez v. State*, __ S.W.3d __, No. 01-12-00688-CR, 2014 WL 7206226 (Tex. App.—Houston [1st Dist.] Dec. 18, 2014).

2014 WL 7205226
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.
OPINION
Court of Appeals of Texas,
Houston (1st Dist.

Raul Rodriguez, Appellant
v.
The State of Texas, Appellee
NO. 01–12–00688–CR | Opinion issued December
18, 2014

**On Appeal from the 178th District Court, Harris
County, Texas, Trial Court Cause No. 1348372**

**Attorneys and Law Firms**
Neal Davis, Bill Stradley, Jonathan Landers, of counsel,
Stradley, Davis & Reynal LLP, Houston, TX, for
Appellant.

Devon Anderson, District Attorney, Clinton A. Morgan,
Assistant District Attorney, Houston, TX, for State.

Panel consists of Chief Justice Radack and Justices
Massengale and Huddle.

## OPINION

Rebeca Huddle, Justice
**\*1** A jury convicted Appellant Raul Rodriguez of murder
and sentenced him to 40 years' confinement, rejecting his
claim that he shot his neighbor, Kelly Danaher, in self-
defense. Rodriguez and the State agree that the trial
court's charge included erroneous instructions regarding a
qualification on self-defense, but they disagree about
whether reversal is warranted. We conclude that it is, and
we reverse and remand for a new trial.

## Background

In the early morning of May 2, 2010, Harris County
police responded to reports of a weapons disturbance in a
rural neighborhood. Upon arriving at the scene, they
discovered that the complainant, Danaher, had been shot

in the street. Two others were struggling to hold down
Rodriguez, who had fired the shots. Everyone other than
Rodriguez had been at a party inside. Danaher, the host of
the party, died at the scene.

Rodriguez's defensive theory was that he fired his
handgun in self-defense after the partygoers threatened
him. The jury rejected Rodriguez's claim after a two-
week trial during which it heard the testimony of
numerous witnesses and observed an audio and video
recording of the incident that Rodriguez captured on his
video camera.

*The video recording*
Much of the video recording consists of Rodriguez
filming the party from across the street, where he was
standing at the side of the road, commenting about the
noise level, and shining a flashlight in the direction of the
party.

About fifteen minutes into the recording, James Storm,
Danaher's father-in-law, approached Rodriguez in a
truck.[1] Storm and Rodriguez argued about the noise level
and, eventually, a few partygoers, including Danaher,
approached them.

[1]     Danaher and his family lived in the home, which was
        owned by Storm.

As Danaher approached, Rodriguez said, "You need to
stop right there. Don't come any closer, please." Danaher
continued walking towards Rodriguez and responded, "I,
you're telling me what to do?" Storm added, "Don't tell
us to stop coming close to you."

With Danaher still approaching, and two other partygoers
now nearby, Rodriguez said, "I'm telling you, I'm telling
you to stop. I said stop right now, or I will shoot you!
Stop! Get back!" A partygoer yelled, "Back up Kelly" and
Rodriguez repeated, "Get back!" Danaher can be seen
backing away from Rodriguez with his hands up, saying
"I ain't got nothing." Rodriguez responded, "Y'all are
drunk. Get away from me."

Danaher moved across the street from Rodriguez, where
other partygoers had gathered and then asked Rodriguez,
"You pulled a gun on me?" Rodriguez acknowledged that
he had, adding "I told you to stop." Then, from opposite
sides of the road, Danaher and Rodriguez continued
arguing about why Rodriguez drew the gun, while Storm

told the partygoers to call the police:

Danaher: I haven't done nothing to you.

Rodriguez: My life is in danger. You got weapons on you.

Danaher: Your life's in danger?

Rodriguez: Stay away from me. You're over here cussing at me and hollering.

...

**\*2** Rodriguez: Get away from me. Keep it down. I got everything videotaped.

Storm: Yeah, call the cops on this jack-off. He's down here out in the middle of the street with a gun.

Rodriguez: Yeah, I told you to stop. I asked you to stop.

Danaher: And what happened? I stopped.

Rodriguez: No, you stopped after I drew my weapon.

Danaher: And I pulled back.

Rodriguez: You stopped after I drew my weapon. I asked you to stop and get back.... I asked you to turn this crap down.

Rodriguez and Danaher continued arguing from opposite sides of the road about the volume of the music, and Rodriguez called the police, to whom he admitted having drawn his gun, and asserted that he was in fear for his life:

Yes, my name is Raul Rodriguez. I called again. I had to draw my weapon on somebody because I had, I told them to stop. They were drunk, they coming at me. I told them to stop. They kept coming and I drew my weapon. Then they stopped, I put my weapon up but now they're saying I'm sitting there waving my gun and everything and I'm not. I'm videotaping everything right now....

You know, it's just me against everybody. I've got, I've got ... Ah look, there's about 15 people here. Look, I'm in fear for my life right now. I'm in very ... That's why I drew my weapon. I'm in fear for my life. Please help me now.... They're going to kill me.

Storm then initiated another exchange with Rodriguez. Storm said that Rodriguez would go to jail for drawing his gun, and Rodriguez again asserted "well, I was in fear for

my life." Storm challenged Rodriguez to a fist fight, saying, "You drop the gun and let's go ahead and duke it out mother f__er." As the exchange continued, Rodriguez, still on the phone, told the dispatcher, "Listen. Now they're wanting to kick my ass. And now they're calling me mother f__er and they want to kick my ass and all this other stuff."

The video depicts another partygoer starting to cross the street toward Rodriguez. Danaher stopped him, saying, "Hey, hey, hey, Ricky.... No, no, no, no. This dude is a f__ing idiot, he will shoot you. He's an idiot."

Meanwhile, Rodriguez continued talking to the dispatcher:

I've got about 15 people here, they're wanting to kick my ass. They want to beat me down. I had to draw my weapon to stop them to keep them from coming to me. I felt my life was in danger, I drew my weapon and then they stopped. I told them to get back. I told them to just to turn it down and then, they started cussing, saying we're going to kick his you know, f'ing ass and all this other stuff, calling all kinds of names and everything cuz I'm, and I says look, I'm videotaping all this right now.... And I mean, I'm scared to death here.

Storm told Rodriguez, "I tell you what pal, you pulled a gun on the wrong mother f__er, ok? ... You remember that." Storm then drove his truck up the driveway toward the house.

Danaher continued arguing with Rodriguez: "You're gonna flash your God damn gun. You're gonna flash your gun?" Danaher again began walking toward Rodriguez, but was stopped by Wilcox, who held him back, saying, "No, no, no."

**\*3** Rodriguez told the dispatcher, "Ok. They're going to escalate this.... They're going to the house to get something to shoot me with." As Storm drove toward the house, Rodriguez said, "Ok look, I'm going to defend myself.... I have to defend myself. I'm gonna have to defend myself." After hearing a loud bang from up the driveway, Rodriguez exclaimed, "Oh s__t."

The video recording became dark, but a partygoer can be

heard yelling, "Don't even do it. Brandon, Brandon, don't do it." Another voice said, "This is bulls__t. You don't pull a gun on me." Rodriguez pleaded with the dispatcher to help, asserting that the partygoers were going to try to kill him:

> It's about to get out of hand, sir. Please help me. Please help me sir. My life is in danger now. He's about to, he says he's about to go in the house, he's gonna be more than equal than me. Now I'm standing my ground here. Now these people are gonna try and kill me.

Toward the end of the recording, the partygoers continued arguing with Rodriguez. Danaher again asked, "You pull a f__ing gun on me at my house?"Wilcox then interjected, saying, "You got a gun in your f__ing ... you got a gun?... What are you, hopped up on coke?" Danaher warned Wilcox, "No, no, no, he's videoing us," and Wilcox responds, "I know he is." Danaher said, "Mother f__er pulled a gun on me."

In the final moments of the recording, Rodriguez told the dispatcher, "Look, I'm not losing to these people any more. I'm just gonna just tell them to stay back. They're drunk. They're swearing." Then a partygoer later identified as Ricky Johnson moved toward Rodriguez and yelled, "Ha ha ha!" Rodriguez dropped the camera, fired his gun and yelled, "God dang it!"

### *Testimony of partygoers*

Five partygoers testified at trial. In general, they testified that as the party was winding down, a few of them noticed a flashlight on the road and walked to the end of the driveway, where they discovered Storm and Rodriguez arguing. Only a few partygoers were present when Rodriguez first drew, then put away, his handgun, but multiple partygoers arrived by the time Rodriguez fired. The partygoers acknowledged that Johnson had stepped into the road, waved his arms, and laughed loudly in the seconds before Rodriguez fired. But they maintained that neither Johnson nor anyone else crossed the center line of the road before Rodriguez fired.

### a. James Tyler

Tyler, Danaher's best friend, testified that Danaher had not yet stepped into the road when Rodriguez first drew his gun, but Tyler acknowledged that he did not see

Rodriguez draw the gun. On cross-examination, Tyler admitted that after he watched the video, he realized that Danaher was in the road when Rodriguez first drew his gun. According to Tyler, Rodriguez put the gun down when Danaher backed off, but Tyler did not see where Rodriguez put the gun.

Tyler testified that no one was talking about rushing Rodriguez or taking the gun from him, but he acknowledged that in the moments before Rodriguez fired, Johnson walked towards Rodriguez at a "pretty rushed pace," "cackling and laughing with his arms waving in the air, like he thought it was funny, being goofy for the camera, and then [Danaher] followed immediately behind him." According to Tyler, Danaher moved toward Rodriguez to try to stop Johnson, and Tyler moved forward to pull Danaher back, but Danaher had already been shot.

**\*4** Tyler testified that when the shots were fired, he was still standing at the edge of Storm's driveway, and Danaher and Johnson were "maybe a step and a half, two steps into the street," but neither had crossed the center line on the road. Tyler acknowledged that in his statement to police, he said that Johnson "kind of ran to [Rodriguez] to apprehend him and take [the gun] from him."

### b. Marshall Stetson

Stetson, who is Danaher's wife's cousin, testified that as soon as he and Danaher walked out to the street, Rodriguez drew his gun and told them to get back. He testified that they were not in the street, but in the middle of the driveway, when Rodriguez first drew the gun.

Stetson testified that when they approached, he could "immediately see" that Rodriguez had a gun on his left side. But he also testified that "when he pulled it straight out on us, that's the first time I seen it in the hand. He was pulling it out." According to Stetson, Rodriguez pulled the gun from a holster on the outside of his pants, he did not see him move any clothing before drawing the weapon out, and the gun was "not concealed" and was "outside his shirt."

Stetson did not remember Johnson laughing in the moments before Rodriguez fired, but he was about an arms-length behind Johnson, on the phone with the police, when Johnson took "two steps" toward Rodriguez and the shooting began. Stetson grabbed for Johnson's shirt, but Johnson fell on the other side of the street, where Rodriguez was standing. According to Stetson, Johnson had not crossed over the center line of the road and was still 10 to 12 feet from Rodriguez when Rodriguez fired.

Stetson ran towards Rodriguez, grabbed for the gun and was himself shot in the buttocks. He struggled with Rodriguez until Wilcox and Storm came to help.

On cross-examination, Stetson admitted that he told police in his initial statement that Johnson took it upon himself to try to wrestle the gun away from Rodriguez and was going after Rodriguez when Rodriguez fired. Rodriguez's counsel cross-examined Stetson about whether Rodriguez's gun had been concealed:

> Rodriguez's counsel: Now, when you—when you first walked down that driveway and you and Kelly [Danaher] came upon Raul, however far away you were from him, I believe you—in—in response to questioning from Ms. Logan, you said that—that the clothing that—that Raul had on made it so that you could see his weapon. Is that what you're saying?

> Stetson: No. I said the way he pulled his gun so quick, he didn't—

> Rodriguez's counsel: And that's—this is kind of an important point, and that's why I'm bringing it up.

> Stetson: All right.

> Rodriguez's counsel: I believe that you said—and correct me if I'm wrong. I believe you said in your testimony earlier today, when he pulled it straight out, it was the first that you could see it?

> Stetson: Yeah.

> Rodriguez's counsel: All right. So your—your testimony is that the first time you saw the weapon is when Raul pulled it out and showed it to you?

> Stetson: Yeah, showed it to us.

#### c. James Storm

Storm, Danaher's father-in-law, testified that around midnight, he saw someone standing in the road and stopped. According to Storm, when Danaher walked up and started talking to Rodriguez, Rodriguez pulled his gun, even though Danaher was not threatening or aggressive. Storm was "pissed off" when he saw Rodriguez draw a gun. Although Rodriguez was saying he was in fear of his life, Storm "didn't know what he feared."

**\*5** Storm eventually drove up the driveway because he believed everyone was going to let the police handle the situation. When he was walking across his porch to the

front door, he heard three gunshots, and turned and ran back towards the road. Storm denied that he was going in the house to get a gun.

#### d. Ricky Johnson

Johnson testified that he was intoxicated, and he did not remember the details of the incident.[2] He did not know who had shot him, and he had no memory of anything that happened before he was shot.

[2]    Johnson was placed in a sedated coma for several days after the incident. The coma was induced with Propofol, which can cause amnesia.

Johnson gave a statement 17 days after the shooting, which contained more detail. Johnson admitted that his statement was based on his own recollection free from outside influences, because he had not talked to other witnesses at the time he gave it. In the statement, Johnson said that some people appeared to be arguing by the road, and that he remembered a man standing in the road, but that he did not see a gun. According to Johnson's statement, he was "pretty sure" that when he got to the end of the driveway, the man said take two more steps and I'll shoot, and Johnson took two more normal steps. But Johnson also asserted in his statement that he was 20 or 25 yards from Rodriguez when Rodriguez fired, and Johnson disagreed that the video indicated he was much closer.

#### e. Brandon Wilcox

Wilcox testified that he walked toward the road when he heard arguing and learned that someone had a gun. When Wilcox approached the road, he only saw Rodriguez's flashlight and video camera, and did not know at the time whether Rodriguez had drawn a gun.

Wilcox knew that others had called the police and believed they were on their way. He saw a flash and a pop, and he ran behind Stetson towards Rodriguez. Stetson fell down, and Wilcox ended up on top of Rodriguez. Wilcox did not see Johnson charge Rodriguez, and believed he would have seen it if it happened.

Wilcox did not recall any discussion among the partygoers about rushing Rodriguez. He testified that when someone on the video recording said, "Brandon, Brandon, don't do it," it was probably in response to Wilcox's comment that Rodriguez "need[ed] his ass

kicked."

### Testimony of officers, investigators, & medical personnel

Deputy J. Soto with the Harris County Sheriff's Office testified that he did not smell alcohol on Rodriguez, but Wilcox, who had been holding down Rodriguez, smelled of alcohol and slurred his speech. Deputy Whitlock, who accompanied Deputy Soto, testified that partygoers were intoxicated.

Detective J. Brown of the Harris County Sheriff's Office testified that Rodriguez had a concealed handgun license, although Brown did not recall seeing the license itself. When Brown arrived at the scene, Rodriguez "still had a nylon holster on his belt." Brown testified that Rodriguez reported taking ASA, Lisinopril, Norco, Paxil, methadone, Effexor, and Xanax, but Brown also testified that he did not believe Rodriguez was intoxicated.

As part of the ensuing investigation, Brown and two other detectives watched the video recording. Brown testified that the initial perception of all three detectives was that someone was attacking Rodriguez when Rodriguez dropped the camera and fired. Brown agreed that Rodriguez's broken leg constituted serious bodily injury. He testified that some of the partygoers smelled of alcohol and that some marijuana was found at the party. He also testified that Danaher's level of intoxication was "relatively high."

**\*6** Pramod Gumpeni, an assistant medical examiner at the Harris County Institute of Forensic Sciences, performed Danaher's autopsy. Danaher had two gunshot wounds, one to the chest and one to the right leg. Gumpeni concluded, based on the lack of stippling on Danaher's skin, that the gun was at least 18 to 24 inches away from Danaher when it was fired, but he admitted that he did not test Danaher's shirt for stippling or gunpowder residue.[3] Gumpeni testified that Danaher had a blood alcohol content of .21.

[3]     According to Gumpeni, stippling results when gunpowder particles contact the skin.

### Testimony of neighbors

#### a. Ken Ellis

Ellis, who lived across the street from Rodriguez, testified that on the night of the party, he was on his porch around ten minutes before midnight and could hear music playing at Storm's house. Ellis saw Rodriguez leaving his property and shouting "shut it down" towards Storm's house. According to Ellis, Rodriguez was waving his flashlight and walking angrily up the street. Ellis heard gunshots about 10 or 15 minutes later.

#### b. Terry Hackathorn

Hackathorn, who lived with Ellis, testified about her conversation with Rodriguez two months before the shooting in which Rodriguez encouraged her to get a concealed handgun license. She described Rodriguez as "very self-confident, very assured" and "excited" during the conversation:

> He had suggested I get hand—a concealed handgun license. And I told him I didn't want one. But he told me it would be my benefit, because if I had a handgun and if I was in public anywhere, then if anybody was, you know, bothering me and if I needed to shoot somebody, that as long as I told the authorities that I was in fear for my life and that I needed to defend myself, and that I believed they had weapons and I stood my ground. And so I shot the son of a bitch.

> Prosecutor: And he said that you could "shoot the son of a bitch"?

> Hackathorn: Yes.

> Prosecutor: Did he specifically say to you, to use the words "in fear of your life"?

> Hackathorn: Yes.

> Prosecutor: And did it surprise you when he said this?

> Hackathorn: No.

> Prosecutor: Okay. And why not?

> Hackathorn: Because he always stayed up-to-date on the law changes when it came to owning handguns.

#### c. Pete Fornols

Fornols lived between the Danahers and Rodriguez. On the night of the party, Rodriguez called Fornols three times before 8:00 p.m. Rodriguez asked whether Fornols could hear "all of the loud s__t" and whether Fornols would go with Rodriguez to "put a stop to this s__t" if it kept going on. Rodriguez told Fornols that he "would

have [his] back," but Fornols "did not want to be a part of it."

Rodriguez went to Fornols's house around 8:30 p.m. According to Fornols, Rodriguez was "rambling on about the noise and that ... if I would go down there with him, that once again that he would have my back...." Fornols testified that Rodriguez seemed "aggressive. His eyes were bulgy, and he was in a—almost like a frantic stage, like, you know, he was just about to pop." Fornols testified that Rodriguez had two weapons on him when he visited at 8:30: one handgun in the front of his pants, and one in the back. They were outside his t-shirt, which was tucked in, and in "plain sight."

Fornols spoke to Rodriguez on the phone again after his 8:30 visit, and Rodriguez was agitated that the police who had responded to the noise complaints "didn't do s__t. They came out here, they sat and they drove off." Rodriguez returned to Fornols's house around 10:30 p.m. and asked Fornols to call the police to complain about the noise. Fornols placed the call anonymously, only to try to calm Rodriguez.

**\*7** Rodriguez called Fornols again at 11:13 p.m., 12:01 a.m. and 12:11 a.m., but Fornols did not answer. When Fornols heard three gunshots around 20 minutes after midnight, he looked out his window into Rodriguez's backyard to see if he was out there "shooting his gun off like he's done a lot."

Fornols also testified about his interaction with Rodriguez on the day before the party. Danaher had come over to Fornols's house to borrow some tools. Rodriguez arrived within two minutes after Danaher left and asked Fornols, "What did that cocksucker want?" Fornols said that Danaher had borrowed some tools, and Rodriguez responded, "I wouldn't loan that son of a b__ch sweat off my balls if he was dying of thirst. He's one of the son of a b__ches that keep us awake at night with loud music."

### Discussion

Rodriguez argues that the trial court's guilt-innocence charge erroneously abrogated his justification defense in that it included incorrect and confusing instructions regarding a qualification on self-defense. The State concedes that there was charge error, but argues that the errors did not harm Rodriguez because he was not entitled to a self-defense instruction in the first instance.

### A. Standard of Review

In analyzing a jury-charge issue, our first duty is to decide if error exists. *See Almanza v. State,* 686 S.W.2d 157, 174 (Tex.Crim.App.1985) (op. on reh'g); *Tottenham v. State,* 285 S.W.3d 19, 30 (Tex.App.–Houston [1st Dist.] 2009, pet. ref'd). Only if we find error do we then consider whether an objection to the charge was made and analyze for harm. *Tottenham,* 285 S.W.3d at 30; *see also Warner v. State,* 245 S.W.3d 458, 461 (Tex.Crim.App.2008) ("The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary for reversal.").

"The degree of harm necessary for reversal depends upon whether the error was preserved." *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App.1996). Error properly preserved by a timely objection to the charge will require reversal "as long as the error is not harmless." *Almanza,* 686 S.W.2d at 171. The Court of Criminal Appeals has interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal. *Arline v. State,* 721 S.W.2d 348, 351 (Tex.Crim.App.1986). However, when the charging error is not preserved "and the accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.' " *Almanza,* 686 S.W.2d at 171; *see Nava v. State,* 415 S.W.3d 289, 298 (Tex.Crim.App.2013) (egregious harm "is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial."). Fundamental errors that result in egregious harm are those which affect "the very basis of the case," deprive the defendant of a "valuable right," or "vitally affect his defensive theory." *Almanza,* 686 S.W.2d at 172 (citations and quotations omitted).

When considering whether a defendant suffered harm, the reviewing court must consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* at 171. The reviewing court must conduct this examination of the record to "illuminate the actual, not just theoretical, harm to the accused." *Id.* at 174; *see Nava,* 415 S.W.3d at 298 (record must disclose "actual rather than theoretical harm").

### B. Applicable Law
**\*8** Texas Penal Code Section 9.31(a) provides that a person is justified in using force against another "when and to the degree the actor reasonably believes the force is

immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). Penal Code Section 9.31(b)(5)(A) qualifies this defense. It states that the use of force against another is not justified "if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was carrying a weapon in violation of Section 46.02." TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (West 2011).

A person violates Section 46.02 of the Penal Code if he intentionally, knowingly, or recklessly carries on or about his person a handgun, illegal knife, or club if the person is not (1) on the person's own premises or premises under the person's control; or (2) inside of or directly en route to a motor vehicle or watercraft that is owned by the person or under the person's control. *See*TEX. PENAL CODE ANN. § 46.02(a) (West Supp.2014). Importantly, however, Section 46.02 does not apply to a person who "is carrying a concealed handgun and a valid license issued under Subchapter H, Chapter 411, Government Code, to carry a concealed handgun." TEX. PENAL CODE ANN. § 46.15(b)(6) (West Supp.2014).

### C. Analysis

### 1. Errors in the charge
The charge spanned 16 pages. The first three pages set forth the abstract law of murder and applied the law of murder to the case. The next five pages set forth the abstract law on self-defense and deadly force and applied this law to the case."[4] Next came three pages of instructions regarding two qualifications on self-defense: the "discussion of differences" qualification and provocation. The balance of the charge contained general instructions and an extraneous offense instruction.

[4]     One paragraph on page 4 instructed the jury not to consider whether Rodriguez failed to retreat, noting that one "who has not provoked the person against whom deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force." The parties devote little attention to this instruction, but we find it noteworthy insofar as it, implicitly if not explicitly, instructs the jury that Rodriguez *did not provoke Danaher* and that Rodriguez *was not engaged in criminal activity* at the time he used deadly force against Danaher. This was confusing because later portions of the charge posed those very questions: page 9 instructed the jury to consider whether Rodriguez committed an offense by intentionally failing to conceal his handgun or by carrying it while intoxicated, and

pages 10–11instructed the jury to consider whether Rodriguez provoked Danaher.

Rodriguez argues that the trial court's instructions regarding the "discussion of differences" qualification contained multiple errors. Among other things, Rodriguez complains that the trial court incorrectly instructed the jury on irrelevant provisions of Penal Code Section 46.035, which defines the offense of unlawful carrying of a handgun by a license holder. The State agrees that it was error to include the irrelevant provisions of Section 46.035. We agree with the parties that the instructions regarding the "discussion of differences" qualification were erroneous.

The instructions appeared on page 9 of the charge. It said:

You are further instructed, as part of the law of this case, and as a qualification of the law on self-defense, that the use of force by a defendant against another is not justified if the defendant sought an explanation from or discussion with the other person concerning the defendant's differences with the other person while the defendant was failing to conceal the handgun that he was carrying as a concealed handgun license holder, in violation of the law.

**\*9** A person commits an offense if, while the person was a holder of a license to carry a concealed handgun, the person intentionally failed to conceal the handgun.

A person commits an offense if, while the person was a holder of a license to carry a concealed handgun, the person carried a handgun and was intoxicated.

"Handgun" means any firearm that is designed, made, or adapted to be fired with one hand.

If you find from the evidence beyond a reasonable doubt that the defendant, Raul Rodriguez, did then and there on May 2 nd, 2010, fail to conceal a handgun in violation of the law stated above, before seeking an explanation from or discussion with the other person concerning the defendant's differences with the other person, then you will find against the defendant on the issue of self-defense.

The first paragraph tracks much of Section 9.31(b)(5)(A), but modifies its final clause. The purpose of the modification was to account for the fact that Rodriguez was carrying a handgun "as a concealed handgun license holder" to whom Section 46.02 would not apply, provided the handgun was concealed. *See*TEX. PENAL CODE ANN. § 46.15(b)(6) (noting that section 46.02 does not

apply to a person who "is carrying a concealed handgun and a valid license"). The first paragraph ends with the phrase "in violation of the law," which is superfluous and confusing in light of the two paragraphs that follow.

The second and third paragraphs on page 9 are based on Section 46.035 of the Penal Code, which defines the offense of unlawful carrying of a handgun by a license holder. The second paragraph is based on subsection (a), while paragraph three was based on subsection (d). *See* TEX. PENAL CODE ANN. § 46.035(a) ("A license holder commits an offense if the license holder carries a handgun on or about the license holder's person under the authority of Subchapter H, Chapter 411, Government Code, and intentionally displays the handgun in plain view of another person in a public place."), (d) ("A license holder commits an offense if, while intoxicated, the license holder carries a handgun under the authority of Subchapter H, Chapter 411, Government Code, regardless of whether the handgun is concealed.") (West Supp.2014). The inclusion of both paragraphs was error because, as the State concedes, "[t]he commission of th[e] offense [of unlawful carrying of a handgun by a license holder] ... does not alter one's ability to invoke the right to self defense...."[5] It is a violation of Section 46.02, not Section 46.035, that may abrogate a self-defense claim. *See* TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (discussion of differences qualification on self-defense applies if the actor was carrying a weapon in violation of Section 46.02). In short, we agree with the parties that the trial court erred in submitting the second and third paragraphs on page 9.

[5] Indeed, Section 46.035(h) states that it is a defense to a violation of Section 46.035(a) "that the actor, at the time of the offense, displayed the handgun under circumstances in which the actor would have been justified in the use of force or deadly force under Chapter 9." TEX. PENAL CODE ANN. § 46.035(h) (West Supp.2014).

**\*10** Rodriguez argues that the use in the final paragraph on page 9 of the word "before" was also erroneous. Section 9.31(b)(5)(A) applies if the actor sought a discussion of differences *"while*... carrying a weapon in violation of Section 46.02." *See* TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (emphasis added). In light of the evidence that Rodriguez's handguns were not concealed when he visited Fornols a few hours before the shooting, Rodriguez argues that the application paragraph's use of "before" could have caused the jury to reject Rodriguez's self-defense claim based on his failure to conceal his handguns while at Fornols's home. The State disagrees,

arguing that the jury could not have been misled in this manner because the paragraph refers expressly to May 2, while the visit to Fornols took place at 8:30 p.m. *on May 1.*

The final paragraph on page 9 expressly referred to failing to conceal a handgun *on May 2nd, 2010.* Because well-established law requires us to presume, in the absence of evidence to the contrary, that the jury followed the trial court's instructions, we do not presume that the jury wrongly believed that it could convict based on Rodriguez's failure to conceal his handguns at Fornols's home at 8:30 p.m. *on May 1. Reeves v. State,* 420 S.W.3d 812, 818 (Tex.Crim.App.2013) (generally, in the absence of evidence to the contrary, appellate court assumes that jury followed charge instructions).

We do, however, conclude that the use of "before" in the final paragraph on page 9 is, at a minimum, confusing in light of the use of "while" in the first and second paragraphs. If the jury believed that Rodriguez acted in self-defense, the applicability of Section 9.31(b)(5)(A) turned on whether Rodriguez's handgun was concealed from the time he sought the discussion of differences until the moment the jury determined he was justified in using force. Thus, it was critical for the jury to determine *w hen* during the sequence of events Rodriguez failed to conceal his handgun.

The charge fell short of making that clear. The first paragraph instructed the jury to consider whether Rodriguez sought a discussion of differences *while* failing to conceal the handgun he was carrying as a concealed handgun license holder; the second instructed it to consider whether Rodriguez failed to conceal *while* he was a holder of a license to carry a concealed handgun; and the final paragraph instructed it to consider whether Rodriguez failed to conceal *before* seeking a discussion of differences. This is far from "the way instructions should be—clear, concise, and to the point." *Reeves,* 420 S.W.3d at 817, 818 (function of charge is not merely to avoid misleading but to lead and to prevent confusion).

**2. Did Rodriguez preserve error?**
Having found error in the charge, we next consider preservation. *Tottenham,* 285 S.W.3d at 30. The record reflects that Rodriguez lodged the following objection to page 9:

> [B]asically, Judge, I think this is improper comment on the weight of the evidence. Also, I don't think the evidence supports this charge in this case.

Specifically, there's absolutely no evidence that—or credible evidence that Raul Rodriguez failed to conceal his firearm or that he was intoxicated.

All right. So let me take both of those if I can, one-by-one.

Failure to conceal a handgun. There was some testimony from Pete—Peter Fornols.... And he testified at some point early in the evening. This is before the shooting ever occurred or Raul ever went over next door. That Raul Rodriguez had two handguns in plain view. One was in the front center waistband, one was to his back center waistband.

And—and so that has no relevance as to the time of the shooting, if Raul was legally carrying a firearm. In other words, at the time of self-defense when he shot the weapon, was he unlawfully displaying a firearm, that would negate that. And so that testimony doesn't really relate to that at all.

**\*11** The only other testimony was, Marshall Stetson said something on direct examination about how Raul Rodriguez had a firearm and it was visible. And it was a little unclear what he said.

But Bill Stradley cross-examined him. And he clearly said, based on my recollection, that what he meant was, he saw the firearm when Raul Rodriguez had actually drawn it on Kelly Danaher. And so, therefore, I don't think there's any credible evidence that Raul—and the State's theory has never been that he didn't conceal the handgun.

And so with that, I don't think there's evidence that supports the instruction. And I also think it's an improper comment on the weight of the evidence.

The State argued in favor of submitting page 9 as it was ultimately submitted:

In Section 931(b), Number 5A, it talks about carrying a weapon in violation of the law. In order to explain what violation of the law is and tracks the statute, that's where we proposed unlawfully carrying a weapon by a concealed handgun license holder.

And the Court, as you know, is required to put an instruction in, if there's some evidence, whether believable or not. And there was evidence by Marshall Stetson and by Pete Fornols, that indicated the defendant was carrying a weapon that was visible.

So if the jury, who is going to be the trier of fact, determines that they're in violation based upon the

instruction, that's their decision to make.

....

[I]t tracks the original charge instruction. Tracks the statute and since there's some evidence that in our particular case, the defendant has a concealed handgun license. That's why we clarified it. Because if you just give it to the jury in violation of the law, they need to be instructed on what that law is.

The trial court then made the following ruling:

Well, I heard the testimony. And Fornols is one thing, statute is another. And he clearly said, "I—first time I saw it is when he pulled it out." But anyway, be that as it may. He said other things too.

So, the issue's been raised and y'all are just going to have to argue the fact question. But I think the issue's been raised, so I'm going to allow that. Objection's overruled.

Error preservation "is not an inflexible concept." *Thomas v. State,* 408 S.W.3d 877, 884 (Tex.Crim.App.2013). "[A]ll a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* (quoting *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App.1992)).

Here, Rodriguez argued that page 9 should not be submitted to the jury at all, because the evidence did not support the submission, and because the instructions constituted an improper comment on the weight of the evidence. He argued that the instructions would allow the jury to incorrectly reject his claim of self-defense based on testimony regarding his alleged failure to conceal during his visit to Fornols's house at 8:30 p.m.

The State responded that the charge should include the violation of law instructions contained in the second and third paragraphs. It argued that Pete Fornols's testimony to the effect that Rodriguez's handguns were not concealed hours before the shooting was at least some evidence that supported submission of the instructions it now concedes were erroneous. The trial court agreed with the State and overruled the objection. Although Rodriguez did not parse the instruction and detail each of the errors in it, we conclude that his objection was sufficient to preserve the error he complains of on appeal. *SeeClark v. State,* 365 S.W.3d 333, 339 (Tex.Crim.App.2012) (noting that issue preserved without having been explicitly stated

if "there have been statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be"); *Lankston,* 827 S.W.2d at 909 (in issue-preservation context, there are "no technical considerations or form of words to be used"); *see also State v. Rosseau,* 396 S.W.3d 550, 555 (Tex.Crim.App.2013) (although defendant's challenge "could have been more clearly presented," "magic language" was not required).

### 3. Were the errors harmless?

**\*12** Because Rodriguez preserved his complaint, we must reverse unless the error is harmless. *See Almanza,* 686 S.W.2d at 171; *see also Arline,* 721 S.W.2d at 351 (any harm, regardless of degree, is sufficient to require reversal). To gauge harm, we review (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *See Almanza,* 686 S.W.2d at 171.

### a. The entire charge

Rodriguez argues that the errors on Page 9 harmed him in two ways: (1) paragraphs two and three allowed the jury to conclude that either Rodriguez's intoxication or his failure to conceal a handgun, alone, would render his use of force unjustified; and (2) the erroneous use of "before" in the final paragraph allowed the jury to conclude that his use of force was not justified because he failed to conceal his handguns earlier in the evening, while talking with Fornols.

As discussed above, the inclusion of the phrase "in violation of the law" in the first paragraph, followed by paragraphs two and three, which have no place in the instruction, permitted the jury to find against Rodriguez on self-defense if, during the discussion of differences, he either (1) "intentionally failed to conceal" the handgun or (2) was intoxicated. The jury heard Rodriguez admit on the video recording that he intentionally drew his handgun and, thus, "intentionally failed to conceal" it during the altercation. Under the trial court's charge, that bare fact was sufficient to abrogate Rodriguez's self-defense claim, regardless of whether the jury believed Rodriguez was justified in using deadly force. Nothing in the charge ameliorated this problem. Indeed, the final paragraph on page 9 exacerbated it by referring the jury back to the violations of the law "stated above."

The State contends that the errors on page 9 actually

benefitted Rodriguez and increased the State's burden. It argues that the jury could have believed that it must find for Rodriguez on the discussion of differences qualification unless the State showed that Rodriguez intentionally failed to conceal *and* was intoxicated. This is a plausible interpretation of the charge, and it could be the one the jury adopted. While we cannot know how the jury interpreted page 9, we know for certain—and the State concedes—that it was confusing. This is enough to weigh in favor of finding some harm. *See Reeves,* 420 S.W.3d at 818 (function of charge is to "prevent confusion").

### b. The evidence

The second *Almanza* factor likewise weighs in favor of finding some harm. Rodriguez conceded that he shot Danaher, and the evidence regarding Rodriguez's only defense, self-defense, was conflicting. On the one hand, the partygoers uniformly testified that they never got close to Rodriguez, emphasizing that they did not cross the center line onto Rodriguez's side of the street before he began firing. The State also adduced evidence that Rodriguez told Hackathorn that, with the benefit of a concealed handgun license, one could shoot somebody and get away with it by telling the authorities that she was in fear for her life and needed to defend herself. This evidence supported the State's theory that Rodriguez manufactured his self-defense claim.

On the other hand, the evidence showed that before Rodriguez first drew his gun, Danaher, at least, had crossed the center line and approached Rodriguez, that Storm and multiple partygoers threatened Rodriguez with bodily injury, and that Rodriguez in fact sustained serious bodily injury, a broken leg. The evidence also showed that, immediately before Rodriguez fired, Johnson suddenly and loudly charged Rodriguez, with his friends following closely behind. Both Johnson and Stetson fell on the side of the street where Rodriguez had been standing, and the forensic testimony showed that Danaher, who was behind Johnson, could have been as close as 18 inches to Rodriguez when he was shot.

**\*13** Given the conflicting evidence, we conclude that conviction was not a foregone conclusion absent the charge error, and that this factor supports reversal. *See, e.g., Burd v. State,* 404 S.W.3d 64, 74–75 (Tex.App.–Houston [1st Dist.] 2013, no pet.)(finding harm sufficient to warrant reversal where self-defense was only issue in case, charge contained error regarding self-defense, and evidence regarding events that led to shooting conflicted).

**c. Counsel's argument**

The State began its closing by arguing that Rodriguez believed that his concealed handgun license conferred special privileges and that Rodriguez lied about fearing for his life. The State then told the jury that Rodriguez had no right to self-defense because he armed himself, sought an explanation, and did not retreat:

> Then starting on Page 9 of your charge, will be a portion that deals with arming yourself and seeking the difficulty, or seeking an explanation for the difficulty.

> This is one of the two factors that you find in this charge that takes away this defendant's right to self-defense. Because he armed himself, because he went down the road to seek an explanation, because he did not abandon his efforts to get an answer out of Kelly Danaher, he has no right to self-defense.

The State thus advanced an incorrect, or at least incomplete, argument regarding the limitations on Rodriguez's claim of self-defense. This argument also contradicted the instruction on page 4 to the effect that the jury should not consider Rodriguez's failure to retreat.

Defense counsel argued in closing that the handgun was not visible before Rodriguez drew it. He said: "There's absolutely no credible evidence in this case that [Rodriguez] walked over there with a gun on his hip that people saw and then he pulled it on Kelly Danaher.... Raul Rodriguez is in the street and everything he's done is legal. It's a public road. He has his gun concealed. He has a concealed handgun license."

Following the defense closing, the State again argued the issue of concealment:

> They brought up the fact that Marshall Stetson made comments during closing—or excuse me, on cross, that he couldn't see a weapon. Well, you'll remember on direct, Donna asked him, "He pulled it straight out. It's the first time I seen it in his hand." "Could you tell whether it was one of those holsters that goes inside your pants, on the outside or the inside?" "It was on the outside."

> We know from the evidence that he didn't pull his shirt back. We know that he pulled the gun right out. We know that right there, use your common sense, he didn't go down there with a jacket on in May. He went down there as a person who knew exactly what he was going to do.

In short, the State, in closing, misstated the law regarding the qualification on self-defense and highlighted the issue

of the handgun's concealment, which was erroneously addressed in the charge. The third factor thus weighs in favor of finding some harm.

**d. Other information in the record**

We find two jury questions also weigh in favor of finding some harm. During deliberations, the jury asked whether a holster had been "taken into evidence." Detective Brown had testified that Rodriguez had a holster on his belt at the time of the shooting, and Stetson testified that Rodriguez drew his gun from a holster. However, Fornols testified that, when Rodriguez visited him four hours earlier, Rodriguez's two guns were in his waistband, and did not mention a holster. The question suggests that the jury reached and was focused on the issue of concealment.

**\*14** The jury also asked to see Rodriguez's medical records. Rodriguez argues that this demonstrates the jury was focused on the question of his intoxication, an issue wrongly submitted in the third paragraph of page 9. The State points out that the jury may have wanted the records to verify Rodriguez's claimed disability. We cannot and need not discern the reason for the jury's inquiry; it is enough that the jury asked for evidence that related to the erroneous intoxication instruction. *See, e.g.,Villarreal v. State,* 205 S.W.3d 103, 110 (Tex.App.–Texarkana 2006, pet. dism'd) (jury note was evidence that jury considered erroneous instruction and supported finding of egregious harm).

Although all of the *Almanza* factors point toward the conclusion that the charge errors harmed Rodriguez, the State argues for the first time on appeal that Rodriguez was not entitled to a self-defense instruction at all. Therefore, the State's argument goes, the errors in the qualification instructions could not have caused harm. Specifically, the State contends: (1) Rodriguez does not dispute that he sought a discussion of differences while carrying a weapon; and (2) there is no evidence that Rodriguez was carrying a concealed handgun or a concealed handgun license as provided by Section 46.15(b)(6); therefore, Section 9.31(b)(5)(A) conclusively applied to prohibit submission of self-defense.

The State's argument raises the question of whether it was Rodriguez's burden to raise evidence demonstrating that Section 46.15(b)(6) applied. While it is well-settled that a defendant bears the burden of adducing some evidence to raise a defense, *see, e.g.,Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App.2003), few cases address the burden to adduce evidence to raise an exception to a qualification of a defense such as Section 46.15(b)(6).

In post-submission briefing, the parties pointed us to *Barron v. State,* No. 05–08–00637–CR, 2010 WL 1294078 (Tex.App.–Dallas Apr. 6, 2010, pet. ref'd). In *Barron,* the court of appeals held that the trial court properly denied a self-defense instruction. *Barron,* 2010 WL 1294078, at *3. But in *Barron,* the evidence established as a matter of law that Barron sought an explanation or discussion of differences with the complainant while *illegally* carrying a handgun; there was "no evidence presented at trial to establish that [Barron] qualified for the traveling exception or that he held a license to carry the handgun used in the shooting." *Id.* Thus, the court concluded that there was no fact issue raised regarding Section 9.31(b)(5)(A); Barron was not justified in using force as a matter of law. *Id.*

This case is different. First, the State introduced Rodriguez's concealed handgun license records and emphasized to the jury that Rodriguez was a concealed handgun license holder. Second, the State adduced evidence regarding whether Rodriguez's gun was concealed. This mattered only if Rodriguez was licensed to carry the gun and the jury was being asked to decide whether the handgun was properly concealed. Third, the State proposed the jury instruction incorporating the Section 46.15(b)(6) exception, and the trial court obliged. Rodriguez could have and would have tried the case differently (i.e., by offering additional evidence to raise Section 46.15(b)(6)) if the State had not conducted itself as if it agreed that a fact issue concerning Section 46.15(b)(6) had been raised. Because the State conducted itself as it did, it is estopped from reversing course now. *See, e.g.,Reed v. State,* 14 S.W.3d 438, 442 (Tex.App.–Houston [14th Dist.] 2000, pet. ref'd) (where State requested defendant undergo psychiatric examination, State was estopped from claiming on appeal that there was no evidence to show a bona fide doubt as to defendant's competence). We therefore reject the State's argument that Rodriguez suffered no harm because he was not entitled to a self-defense instruction in the first instance.[6] *See id.*

[6] The State also relies upon *Davis v. State,* 276 S.W.3d 491 (Tex.App.–Waco 2008, pet. ref'd), and *Williams v. State,* 35 S.W.3d 783 (Tex.App.–Beaumont 2001, pet. ref'd), to support its argument that self-defense should not have been submitted. But these cases, like *Barron,* are inapposite, because in each, the State proved as a matter of law that the defendant could not lawfully carry a gun.

**\*15** In sum, the trial court's erroneous charge caused Rodriguez some harm because Rodriguez conceded that he shot Danaher, and his claim of self-defense was thus the focus of, and, indeed, "the very basis of the case." *Almanza,* 686 S.W.2d at 172. The errors were not cured by other instructions or closing argument, the evidence on self-defense was conflicting, closing argument highlighted the issues addressed in the erroneous instructions, and questions from the jury demonstrated that it focused on the erroneous instructions during deliberations. *SeeAlmanza,* 686 S.W.2d at 171; *see alsoArline,* 721 S.W.2d at 351 (any harm, regardless of degree, is sufficient to require reversal).

We sustain Rodriguez's first issue. Because we have found that the guilt-innocence charge error regarding the discussion of differences qualification on self-defense warrants reversal, we need not consider Rodriguez's remaining issues.

### Conclusion

We conclude that the charge error related to self-defense, Rodriguez's sole defense, was not harmless. Therefore, we reverse the judgment of the trial court and remand for a new trial.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.