Harvey Brown, Justice
Cornelius Harper was convicted of capital murder of multiple persons and sentenced to confinement for life.[1] In eight issues, Cornelius contends that (1) there is legally insufficient evidence that he committed the murders, (2) there is legally insufficient evidence the murders were committed either during the same criminal transaction or pursuant to the same scheme or course of conduct, (3) his right to an unanimous verdict was violated, (4) the trial court abused its discretion by excluding testimony that he maintained his innocence while incarcerated awaiting trial, (5) the trial court abused its discretion by excluding testimony that the State's jailhouse informant testified falsely during trial, (6) the trial court abused its discretion by excluding evidence of a pertinent character trait of a State witness, (7) he has been deprived of a true and accurate reporter's record, and (8) the trial court abused its discretion by permitting the trial proceedings to continue after he became incompetent. We affirm.
Background
Leiah is stabbed at her duplex
Leiah Jackson and her boyfriend, Yancey Daniels, lived together in the back unit of a duplex in Missouri City. The property was owned by Leiah's mother, Pamela Jackson, who lived in the front unit.
One early fall morning, around 12:30 a.m., Pamela heard a loud noise at the front of her unit, opened the front door, and found Leiah, then eight-and-a-half-months pregnant, lying on the ground, bleeding from multiple stab wounds. Pamela called 911.
Pamela testified that, while the two waited for the paramedics, Leiah's eyes began to close, and Leiah told her, "Yancey's cousin did this and Yancey's not here." Leiah was taken to a Houston hospital, *227 where she and the baby were pronounced dead.
When the police arrived at the duplex, they found Yancey's SUV with blood spattered on the inside and outside of the vehicle. The SUV had a window broken out, but there was no broken glass on the ground, indicating the window had been broken elsewhere. The police recovered four spent .380 caliber bullet casings from inside the vehicle and found gunshot residue in the center console. In the front yard, the police found a .380 caliber handgun and a trail of fresh blood between the two duplex units.
Inside the back unit, the police found blood on light switches and doorknobs leading to the back bedroom-where, according to Pamela, Yancey had recently said he kept a large amount of cash. The police observed that the items in the room's closet appeared to be disturbed, with a container pulled out and its contents emptied onto the floor. The police further observed that the blood trail continued from the back bedroom out the backdoor to the backyard, where part of the fence was down, indicating that the perpetrator had exited through the backdoor.
A neighbor, Matthew Fields, told the police that around the time of the stabbing, he heard a woman scream and then a loud "thud," like someone landing after jumping over a fence. Matthew said he then saw a figure in the yard next to his, directly behind the duplex, walking away from the scene. Matthew said that he believed the figure was tall because his head was above the fence line.
Yancey's body is found at a nearby apartment complex
Later that day, the police found Yancey's body in the courtyard of an apartment complex in nearby Houston. Yancey had been shot seven times at close range, including twice in the head. The police found a fired bullet and fresh, broken automotive glass at the scene of Yancey's murder.
Cornelius becomes the primary suspect
As the police investigated the murders, Cornelius quickly became the primary suspect. The police determined that Cornelius and Yancey were first cousins and that Cornelius was the only cousin who Yancey saw on a regular basis.[2]
They further determined that, on the afternoon before the murders, Cornelius met with Yancey and Leiah at the house of Yancey's father, Bill Daniels. Bill testified that Cornelius had been coming to his house looking for Yancey for about a month, and Yancey appeared to have been avoiding him. According to Bill, when Cornelius arrived that afternoon, he seemed agitated. When Yancey, Leiah, and Cornelius finished visiting with Bill, the three of them drove off in Yancey's SUV.
Later that evening, sometime after 10:30 p.m., Cornelius returned to Bill's house in Yancey's SUV to pick up a car battery. Cornelius said they needed it to jump Yancey's other car, a Mitsubishi. Yancey did not come into Bill's house, and Bill never saw whether Yancey was actually with Cornelius.
At 11:36 p.m., Cornelius called his friend, Marina Honeycutt, from Yancey's phone. Marina testified that Cornelius told her that he was buying a Mitsubishi from his cousin (presumably Yancey) and that he was going to come see her that night at her apartment-which was in the same complex where Yancey's body was later found. Marina further testified that Cornelius never actually visited her that night.
*228 In the early morning following the murders, around 4:00 a.m., Bill's daughter and Yancey's sister, Tarhonda Daniels, learned that Leiah had been stabbed and that Yancey was missing. She drove to Bill's house and told him what had happened to Leiah.
Around 7:00 a.m., Bill and Tarhonda drove to Cornelius's apartment, looking for Yancey.[3] When they told Cornelius that Leiah had been stabbed and that both she and her baby were dead, Cornelius responded, "The baby is dead, too?" Bill testified that he believed Cornelius was surprised that the baby was dead, but not Leiah. Tarhonda testified that she believed Cornelius was feigning shock at hearing the news. When they asked about Yancey, Cornelius told them that he had been dropped off by Yancey around 10:00 p.m. the night before, went to bed, and had not heard from him since. Tarhonda testified that Cornelius did not appear to have been sleeping when they arrived.
Later that morning, while Bill and Tarhonda were still looking for Yancey, Cornelius drove to Bill's house and spoke with Bill's friend, Robbie Cooper. Robbie told Cornelius that Bill and Tarhonda had driven to somewhere on West Airport Boulevard, which (unbeknownst to Robbie) was the main street of the apartment complex where Yancey's body was later found. When Cornelius heard this, he became visibly upset and began hitting the washing machine and dryer.
That afternoon, the police searched Cornelius's apartment, which he shared with his then-girlfriend, Ana Pina. The police found several spent .380 caliber bullet casings. The police then searched the car that Cornelius had driven to Bill's house the day before and found more .380 caliber bullet casings.
A firearms analysis later showed that the casings found in Cornelius's apartment and car and the bullets recovered from Yancey's body and found at the apartment complex where his body was located were all fired by the handgun found at the duplex. The analysis further showed that the handgun's magazine spring was broken and that it had problems extracting spent casings, causing it to jam.
Later that afternoon, the police interviewed Cornelius. During the interview, the police noticed that Cornelius's knuckles were red and swollen and that he had scratches on his hands. Cornelius initially denied owning a handgun but later admitted that he had owned one after the police told him they had found casings in his apartment. Cornelius told the police that he had spent the previous evening with Leiah and Yancey but returned home around 10:20 p.m.
The police then interviewed Ana. Ana said that Cornelius told her to tell them that he had arrived home the previous evening at 10:20 p.m., even though she was asleep and did not know what time he actually returned.
Cornelius is indicted, tried, and convicted
Cornelius was indicted for the capital murder of Yancey, Leiah, and their unborn child. The State's theory was that Cornelius first shot Yancey and then stabbed Leiah. The State presented evidence from the duplex, the apartment complex where Yancey's body was found, and Cornelius's apartment. The State also presented testimony from multiple witnesses, including an inmate with whom Cornelius had spent a significant amount of time while awaiting trial, Tyler Quinn, who testified in detail that Cornelius had confessed to the murders.
*229 The jury found Cornelius guilty, and the trial court sentenced him to confinement for life. Cornelius appeals.
Legal Sufficiency
In his first issue, Cornelius contends that there is insufficient evidence that he murdered Yancey, Leiah, or their unborn child. In his third issue, Cornelius contends that, even if there is sufficient evidence that he murdered Yancey, Leiah, and their unborn child, there is insufficient evidence that he committed the murders either during the same criminal transaction or pursuant to the same scheme or course of conduct. We will consider these two issues together.
A. Standard of review
When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; see Adames v. State , 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that Jackson standard is only standard to use when determining sufficiency of evidence). The jury is the exclusive judge of the facts and the weight to be given to the testimony. See Bartlett v. State , 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).
We afford almost complete deference to the jury's credibility determinations. Lancon v. State , 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We may not reevaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. Williams v. State , 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Rather, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson , 443 U.S. at 319, 99 S.Ct. 2781 ; Thornton v. State , 425 S.W.3d 289, 303 (Tex. Crim. App. 2014).
Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. Sorrells v. State , 343 S.W.3d 152, 155 (Tex. Crim. App. 2011) ; Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Evidence is legally insufficient when the 'only proper verdict' is acquittal." Nelson v. State , 405 S.W.3d 113, 122 (Tex. App.-Houston [1st Dist.] 2013, pet. ref'd) (quoting Tibbs v. Florida , 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ).
B. The evidence is legally sufficient to support Cornelius's conviction
Cornelius was charged with capital murder under Section 19.03(a)(7) of the Penal Code. Section 19.03(a)(7) provides that a person commits capital murder if he "commits murder as defined under Section 19.02(b)(1)" and "murders more than one person" either "during the same criminal transaction" or "during different criminal transactions but ... pursuant to the same scheme or course of conduct...."[4] TEX. PENAL CODE § 19.03(a)(7).
The difference between murders that occur "during the same criminal *230 transaction" and murders that occur "pursuant to the same scheme or course of conduct" is "the degree of 'the continuity of the killing.' " Coble v. State , 871 S.W.2d 192, 198 (Tex. Crim. App. 1993) (quoting Rios v. State , 846 S.W.2d 310, 314 (Tex. Crim. App. 1992) ). Murders occur "during the same criminal transaction" when the evidence shows a "continuous and uninterrupted chain of conduct occurring over a very short period of time...." Heiselbetz v. State , 906 S.W.2d 500, 506 (Tex. Crim. App. 1995) (quoting Vuong v. State , 830 S.W.2d 929, 941 (Tex. Crim. App. 1992) ); see Coble , 871 S.W.2d at 198-99 (holding that murders occurred "during the same criminal transaction" when they "occurred in close proximity to each other, on the same road, within a few hours of each other, in a continuous and uninterrupted series of events"). Murders occur "pursuant to the same scheme or course of conduct" when the evidence shows a break in conduct but an "over-arching objective or motive...." Feldman v. State , 71 S.W.3d 738, 754 (Tex. Crim. App. 2002).
The trial court's charge instructed the jury to find Cornelius guilty of capital murder if it determined beyond a reasonable doubt that Cornelius murdered Yancey, Leiah, and their unborn baby either during the same criminal transaction or pursuant to the same scheme or course of conduct by shooting Yancey and stabbing Leiah.
At trial, the State presented testimony from numerous witnesses, including:
• Leiah's mother, Pamela, who testified that Yancey said he kept a large amount of cash in the back bedroom closet and that Leiah's dying declaration was "Yancey's cousin did this";
• Yancey's father, Bill, who testified that Cornelius was Yancey's first cousin, the only cousin Yancey saw on a regular basis, and the only cousin Yancey was with the evening he and Leiah were murdered and that, in the month leading up to the murders, Cornelius had been looking for Yancey and Yancey had been avoiding Cornelius;
• Yancey's sister, Tarhonda, who testified that Cornelius appeared to feign shock when she and Bill told him that Leiah had been stabbed and that he did not appear to have been sleeping when they arrived at his apartment that morning;
• Yancey, Leiah, and Pamela's neighbor, Matthew, who testified that, on the evening of the stabbing, he heard a scream and a thud and then saw a tall figure in the yard directly behind the duplex, walking away from the scene;
• Cornelius's friend, Marina, who testified that she received a call from Cornelius from Yancey's phone the evening of the murders, and that Cornelius told her he was going to visit her at her apartment complex, which is where Yancey's body was later found;
• Marina's roommate, Savannah Weaver, who testified that Cornelius was known to carry a handgun and a knife, the latter of which was capable of inflicting the types of wounds received by Leiah;
• Cornelius's girlfriend and roommate, Ana, who testified that Cornelius told her to tell police that he had arrived home at 10:20 p.m. on the night of the murders even though she was asleep and did not know what time he actually returned;
• Bill's friend, Robbie, who testified that Cornelius became upset when he learned that Bill and Tarhonda had driven to the apartment complex *231 where Yancey's body was later found;
• the jailhouse informant, Tyler, who testified in detail about Cornelius's confession to the murders; and
• Cornelius himself, who testified that he is tall-between 6'7' and 6'8'-and who admitted, during cross-examination, that he owned two .380 handguns, had given both guns to Yancey at various times, and lied about what happened to these guns in his statement to the police.
The State also presented numerous pieces of physical evidence recovered from the two crime scenes and Cornelius's apartment, which connected the murders, reflected how and when they occurred, and indicated that Cornelius was the perpetrator. This evidence included:
• the firearms analysis, which showed that the .380 caliber bullets recovered from Yancey's body and the spent .380 caliber casings found in Cornelius's apartment were all fired from the .380 caliber handgun found in the front yard of the duplex and that the gun had a broken magazine spring and problem extracting spent casings, indicating that the handgun may have jammed at some point in the night;
• the gunshot residue inside Yancey's SUV, the SUV's missing driver's side window, and the fresh, broken automotive glass found at the apartment complex where Yancey's body was found, which indicated that Yancey was shot inside the SUV while parked at the apartment complex and that the SUV was then driven to the duplex by the perpetrator, where he stabbed Leiah; and
• the blood trail inside the duplex, disturbed state of the back bedroom closet, and the downed part of the backyard fence, which indicated that the perpetrator reentered the duplex after stabbing Leiah, searched for something inside the back bedroom closet, and then exited through the backyard.
From this evidence, a rational factfinder could have found that, on the night of the murders, Cornelius and Yancey drove Yancey's SUV to the apartment complex, where Cornelius shot Yancey and left his body. Cornelius then drove Yancey's SUV to the duplex, where he entered the back unit, found Leiah and attempted to shoot her but his gun jammed. He then took out his knife and chased her outside, where he stabbed her sixteen times. He went back inside, searched for the cash Yancey said he kept in the backroom closet, and then exited through the backdoor, jumped the backyard fence, and fled the scene on foot. Thus, a rational factfinder could have found that Cornelius murdered Yancey, Leiah, and their unborn child either during the same criminal transaction or pursuant to the same scheme or course of conduct.
We hold that there is legally sufficient evidence to support Cornelius's conviction. Therefore, we overrule Cornelius's first and third issues.
Jury Unanimity
In his second issue, Cornelius argues that he was egregiously harmed because the charge violated the unanimity requirement by failing to require the jury to agree on which complainants he murdered or the method by which he murdered them.
A. Applicable law and standard of review
In all criminal cases, "the jury must be unanimous in finding every constituent element of the charged of *232 fense...." Saenz v. State , 451 S.W.3d 388, 390 (Tex. Crim. App. 2014) (quoting Jourdan v. State , 428 S.W.3d 86, 94 (Tex. Crim. App. 2014) ). When a defendant is charged with capital murder of multiple persons under Section 19.03(a)(7) of the Penal Code, the unanimity requirement is violated if the charge does not require the jury to agree on which alleged victims the defendant murdered. See Saenz , 451 S.W.3d at 391-92 (holding that jury instruction in capital murder prosecution arising from deaths of five victims violated defendant's right to unanimous jury verdict because instruction did not specify murder of any one victim as predicate murder and did not require jury to specify which alleged victims defendant had murdered).
We review a claim of jury charge error in two steps. Serrano v. State , 464 S.W.3d 1, 7 (Tex. App.-Houston [1st Dist.] 2015, pet. ref'd). First, we determine whether there is error in the jury charge. Id. Second, if there is error, we determine whether sufficient harm was caused by that error to require reversal. Id.
"The degree of harm necessary for reversal depends upon whether the error was preserved." Rodriguez v. State , 456 S.W.3d 271, 280 (Tex. App.-Houston [1st Dist.] 2014, pet. ref'd) (quoting Hutch v. State , 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) ). If error is preserved, reversal is required upon a showing of "any harm, regardless of degree...." Rodriguez , 456 S.W.3d at 280.
But if error is not preserved, then reversal is required only upon a showing of "egregious harm." Id. (quoting Almanza v. State , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) ). Egregious harm is a "high and difficult standard" to satisfy. Villarreal v. State , 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting Reeves v. State , 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) ). Charge error results in egregious harm when "it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." See Allen v. State , 253 S.W.3d 260, 264 (Tex. Crim. App. 2008). The appellant must show actual rather than theoretical harm to support a finding of egregious harm. Villarreal , 453 S.W.3d at 433 ; Cosio v. State , 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).
B. Failure to require unanimity as to victims was harmless
The charge instructed the jury to find Cornelius guilty of capital murder upon finding that he committed one of four combinations of murders. Specifically, the charge instructed the jury to find Cornelius guilty upon finding that he murdered (1) Leiah and the baby, (2) Leiah and Yancey, (3) Yancey and the baby, or (4) Yancey, Leiah, and the baby.
Cornelius argues that the charge was erroneous because it did not require the jury to agree on which complainants he murdered. Assuming without deciding that Cornelius is correct, we must assess the error for egregious harm because Cornelius did not object in the trial court that the charge did not require a unanimous verdict. In assessing whether harm was egregious, "we consider: (1) the charge; (2) 'the state of the evidence, including contested issues and the weight of the probative evidence'; (3) the parties' arguments; and (4) all other relevant information in the record." Cosio , 353 S.W.3d at 777 (quoting Hutch , 922 S.W.2d at 171 ) (brackets omitted).
1. Charge
The charge permitted the jury to convict Cornelius for capital murder without agreeing on which complainants he murdered. Assuming this is error, this factor weighs in favor of finding egregious harm.
*233 See Arrington v. State , 451 S.W.3d 834, 841 (Tex. Crim. App. 2015) (jury instructions weighed in favor of finding egregious harm because they permitted non-unanimous verdicts).
2. State of evidence
The evidence weighs against egregious harm when the defendant could not have committed one offense without committing the other. See Jourdan , 428 S.W.3d at 96 (finding no egregious harm where unanimity error existed but defendant could not have committed one offense without committing the other). There is no evidentiary basis from which a reasonable jury could have determined that the person who killed Leiah was different from the person who killed the baby, and there is compelling evidence (detailed above) that the person who killed Yancey also killed Leiah and the baby. The state of the evidence weighs strongly against finding egregious harm.
3. Parties' arguments
At trial, Cornelius's defense was all-or-nothing. He did not argue that he killed just one of the three victims. Rather, he argued that he did not kill any of them. The jury manifestly rejected Cornelius's all-or-nothing defense, and this weighs against finding egregious harm. See Arrington , 451 S.W.3d at 841-44.
4. Other relevant information
There are not any other relevant issues that have a substantial bearing on our analysis. This factor weighs neither for nor against finding egregious harm. See id. at 844.
Thus, the charge itself is the only factor that potentially weighs in favor of harm. The state of the evidence and the parties' arguments weigh in favor of finding no egregious harm, and there are no other relevant issues that have a substantial bearing on the case. We hold that Cornelius was not egregiously harmed by the presumed charge error. See Cosio , 353 S.W.3d at 777-78 (finding no egregious harm where only charge error factor weighed in favor of harm); Arrington , 451 S.W.3d at 845 (same); see also Saenz v. State , 479 S.W.3d 939, 953-54 (Tex. App.-San Antonio 2015, pet. ref'd) (holding error in failing to require jurors to agree on any one specific murder that would have served as the predicate murder necessary for capital murder conviction was not egregiously harmful).
C. Failure to require unanimity as to method was not error
Cornelius further contends that the charge did not require the jury to agree on the method of capital murder: some jurors could have found that the murders were committed "during the same criminal transaction" while others could have found that the murders were committed "pursuant to the same scheme or course of conduct." See TEX. PENAL CODE § 19.03(a)(7). Cornelius's contention is correct but irrelevant. "The unanimity requirement is not violated by instructing the jury on alternate theories of committing the same offense...." Saenz , 451 S.W.3d at 390 (quoting Martinez v. State , 129 S.W.3d 101, 103 (Tex. Crim. App. 2004) ); see Davis v. State , 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) ("Nothing prohibits a single capital murder from containing alternate underlying offenses that are the same statutory offense but with different victims or different underlying methods of commission, so long as the same victim is alleged with respect to the predicate murder.").
Therefore, we overrule Cornelius's second issue.
Exclusion of Testimony and Evidence
In his fourth, fifth, and sixth issues, Cornelius contends that the trial court violated *234 his constitutional right to present a full and complete defense by (1) excluding testimony from four inmates, Sean Adams, Rodney Finister, Maikel Valdes Amaro, and Miguel Arreola; (2) excluding testimony from Tyler Quinn's ex-girlfriend, Jennifer Watts; and (3) excluding evidence that the lead detective, Sgt. B. Roberts, had once been suspended by the police department.
1. Applicable law
"Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." Potier v. State , 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). The Court of Criminal Appeals has explained that "there are two distinct scenarios in which rulings excluding evidence might rise to the level of a constitutional violation: 1) a state evidentiary rule which categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence which is vital to his defense; and 2) a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence which 'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.' " Wiley v. State , 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (quoting Potier , 68 S.W.3d at 665 ).
Cornelius contends that the trial court's rulings fall under the second category. "In the second category, the rule itself is appropriate, but the trial court erroneously applies the rule to exclude admissible evidence to such an extent that it effectively prevents the defendant from presenting his defensive theory. In other words, the erroneous ruling goes to the heart of the defense." Wiley , 74 S.W.3d at 405.
2. Exclusion of inmates' testimony
Cornelius made an offer of proof in which the inmates testified that Cornelius maintained his innocence while incarcerated in jail awaiting trial.
Cornelius contends that the inmates' testimony was necessary to correct the "false impression" that he had only recently denied committing the murders. But there was plenty of other evidence available to correct any "false impression" the State may have created, such as the recording of Cornelius's initial interview with the police, in which he maintained his innocence. Indeed, Cornelius himself testified that he always claimed he was innocent.
Cornelius further contends that the inmates' testimony was necessary to rebut Tyler's testimony that Cornelius did not talk to any other inmate about his case. But again, there was other evidence he could have presented to rebut Tyler's testimony, such as his own testimony. And even if there was no other evidence to rebut Tyler's testimony that Cornelius only spoke with him about the case, the exclusion of the inmates' testimony did not effectively prevent Cornelius from presenting his defensive theory. Id. Whether Cornelius spoke with the other inmates is not an issue that went to the heart of his defense. Id. The central issue concerning Tyler was whether Cornelius confessed to him that he committed the murders. But none of the inmate testimony rebutted Tyler's testimony regarding Cornelius's alleged confession. None of the inmates testified that Cornelius did not confess the offense to Tyler; they only testified that he denied committing the offense to them.
Cornelius has failed to show that the exclusion of the inmates' testimony effectively prevented him from presenting the heart of his defensive theory. See ids="9435044" index="51" url="https://cite.case.law/sw3d/74/399/#p405">id. We hold that the trial court's exclusion of their testimony did not violate Cornelius's constitutional rights.
*235 3. Exclusion of informant's ex-girlfriend's testimony
Cornelius made an offer of proof in which Jennifer testified that Tyler had (1) lied to the jury in Cornelius's trial about the amount of money he received from the robbery for which he was then under indictment and (2) stolen items from her and her mother. Cornelius contends that the trial court's exclusion of this testimony violated his constitutional right to present a full and complete defense. Cornelius argues that the testimony was necessary to show that Tyler was liar. We disagree.
At trial, Jennifer was permitted testify that Tyler had a reputation for dishonesty. Cornelius offered his own testimony, which also rebutted Tyler's testimony. And Tyler himself admitted that he hoped to receive leniency in his aggravated robbery case for testimony against Cornelius. From all this, the jury could have readily inferred that Tyler had an incentive to lie and did in fact lie about Cornelius's confession.
Like the exclusion of the inmates' testimony, Cornelius has failed to show that the exclusion of Jennifer's testimony effectively prevented him from presenting the heart of his defensive theory. See ids="9435044" index="52" url="https://cite.case.law/sw3d/74/399/#p405">id. We hold that the exclusion of Jennifer's testimony did not violate Cornelius's constitutional rights.
4. Exclusion of evidence of detective's previous suspension
Cornelius contends that the trial court erred in excluding evidence that the lead detective, Sgt. B. Roberts, had once been suspended by the police department for failing to investigate other leads in previous murder cases. Cornelius contends that the evidence was necessary to show that Sgt. Roberts failed to investigate other leads in this case and that the trial court's ruling violated his constitutional right to present a full and complete defense. We disagree.
Cornelius has not shown that the trial court's exclusion of evidence concerning Sgt. Roberts's suspension effectively prevented him from presenting the heart of his defensive theory. See ids="9435044" index="53" url="https://cite.case.law/sw3d/74/399/#p405">id. Cornelius did not require evidence of Sgt. Roberts's prior suspension to show that Sgt. Roberts did not investigate other leads in his case; all he had to do was question Sgt. Roberts and the other detectives about which leads they did and did not investigate. We hold that the exclusion of evidence of Sgt. Roberts's prior suspension did not violate Cornelius's constitutional rights. Therefore, we overrule Cornelius's fourth, fifth, and sixth issues.
Reporter's Record
In his seventh issue, Cornelius contends that he "has been deprived of a true and accurate record of his trial."
Appellate Rule 34.6(f) establishes when an appellant is entitled to a new trial due to the loss or destruction of the reporter's record. Under Rule 34.6(f), an appellant is entitled to a new trial:
(1) if the appellant has timely requested a reporter's record;
(2) if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or-if the proceedings were electronically recorded-a significant portion of the recording has been lost or destroyed or is inaudible;
(3) if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and *236 (4) if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.
TEX. R. APP. P. 34.6(f) ; see Routier v. State , 112 S.W.3d 554, 571 (Tex. Crim. App. 2003) (explaining that "the appellant must show (1) that a significant portion of the record was lost or destroyed, (2) through no fault of her own, (3) that the missing portion of the record is necessary to her appeal, and (4) the parties cannot agree on the record").
The reporter's record in this case is over 70 volumes and thousands of pages long. Cornelius argues that he is entitled to a new trial because 17 pages include discussions that are marked as inaudible instead of being fully transcribed. We have reviewed each page cited by Cornelius.
One page is a bench conference where the trial court and lawyers discuss whether Cornelius may cross-examine a witness about an allegedly prior inconsistent statement. Cornelius does not explain why the untranscribed portion of the bench conference is necessary to resolve his appeal or to identify the specific issue to which it relates. Further, bench conferences do not have to be recorded at trial if not specifically requested, and Cornelius has not shown that he ever requested that bench conferences be recorded in this case.
Four pages contain discussions of the trial court's and lawyers' upcoming potential scheduling conflicts and other non-substantive issues, such as whether to release an alternate juror to allow her to go on vacation and whether to dismiss a seated juror who had been sleeping.
Nine pages contain testimony from Tyler, Cornelius, and one of Cornelius's former fellow inmates, Eddie Morales.[5] None of the testimony is obscured or otherwise rendered unintelligible by the untranscribed portions, and most of it is not even relevant to the issues on appeal.
Three pages contain parts of the charge conference when the trial court and lawyers are discussing whether to include a limiting instruction concerning evidence of a prior conviction for aggravated robbery. Again, none of the discussion is obscured by the untranscribed portions, and the topic under discussion is not relevant to this appeal.
We hold that Cornelius has failed to show that the untranscribed portions of the record, presumably due to inaudible speaking, are necessary to resolve his appeal. See TEX. R. APP. P. 34.6(f)(3) ; Routier , 112 S.W.3d at 571. Therefore, we overrule Cornelius's seventh issue.
Competency to Stand Trial
In his eighth issue, Cornelius contends that the trial court abused its discretion by permitting the trial proceedings to continue after he became incompetent.
"A criminal defendant who is incompetent may not be put to trial without violating due process." Turner v. State , 422 S.W.3d 676, 688 (Tex. Crim. App. 2013). Under Article 46B.003 of the Code of Criminal Procedure, a defendant is incompetent to stand trial if he does not have: (1) sufficient present ability to consult with *237 his lawyer with a reasonable degree of rational understanding or (2) a rational and factual understanding of the proceedings against him. TEX. CODE CRIM. PROC. art. 46B.003(a) ; see also Turner , 422 S.W.3d at 689. A defendant is presumed competent to stand trial unless proved incompetent by a preponderance of the evidence. TEX. CODE CRIM. PROC. art. 46B.003(b).
On suggestion that the defendant may be incompetent to stand trial, the trial court must informally inquire whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial. Id. art. 46B.004(c); see Turner , 422 S.W.3d at 691-92 ("Under our current statutory scheme, any 'suggestion' of incompetency to stand trial calls for an 'informal inquiry' to determine whether evidence exists to justify a formal competency trial."). If after an informal inquiry, the trial court determines that evidence exists to support a finding of incompetency, the trial court must appoint one or more disinterested experts to examine the defendant. TEX. CODE CRIM. PROC. arts. 46B.005(a), .021(b). If the defendant wishes to be examined by an expert of his own choice, the trial court, on timely request, must provide the expert with reasonable opportunity to examine the defendant. Id. art. 46B.021(f).
The statute lists factors that the expert must consider during the examination and in any report based upon the examination, and also sets out the required contents of the expert's report. Id. arts. 46B.024, .025. During the examination and in the report, the expert must consider the capacity of the defendant during criminal proceedings to: (A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings; (B) disclose to counsel pertinent facts, events, and states of mind; (C) engage in a reasoned choice of legal strategies and options; (D) understand the adversarial nature of criminal proceedings; (E) exhibit appropriate courtroom behavior; and (F) testify. Id. art. 46B.024(1). The expert's report must state an opinion on a defendant's competency or incompetency to stand trial or explain why the expert is unable to state such an opinion. Id. art. 46B.025(a).
In the middle of trial, defense counsel raised the issue of Cornelius's competency. After an informal inquiry, the trial court determined that some evidence existed to support a finding of incompetency and ordered an examination of Cornelius. Id. arts. 46B.005(a), .021. The trial court appointed a psychiatrist, Dr. Allen Axelrad, to perform the examination. Id. art. 46B.021. The trial court permitted Cornelius's expert of choice, another psychiatrist, Dr. George Glass, to perform an examination as well. Id. art. 46B.021(f). The trial court then held a hearing at which both psychiatrists testified.
Dr. Axelrad testified that he found that Cornelius had: (1) mild deficits in his rational understanding of the charges, the potential consequences, and the pending proceedings; (2) mild-to-moderate deficits in his capacity to disclose to counsel pertinent facts, events, and states of mind; (3) a moderate-to-severe deficit in his capacity to engage in a reasoned choice of legal strategies and options; (4) a mild deficit in his understanding of the adversarial nature of the proceedings; (5) a mild deficit in his ability to exhibit appropriate courtroom behavior; (6) a moderate-to-severe deficit in his ability to testify; and (7) a moderate deficit in his capacity to engage with counsel.
Dr. Axelrad testified that, in his opinion, although Cornelius suffered from certain deficits, he was nevertheless competent to stand trial because he had sufficient "residual functional capacity." Dr. Axelrad explained *238 that even defendants with serious mental disabilities can be competent to stand trial due to their "residual functional capacity" and that some of Cornelius's impairment was due to him discontinuing his medications.
Dr. Glass testified that, in his opinion, Cornelius was incompetent. Dr. Glass testified that Cornelius provided him a "rational explanation" of "why he was not guilty and why he did not think he should be found guilty." But he further testified that Cornelius was unable to engage in a reasoned choice of legal strategies and options. According to Dr. Glass, although Cornelius claimed he was innocent, he would not work with his attorneys because he was convinced he was going to be convicted and therefore wanted to make sure he received the death penalty-which he preferred to life in prison-by testifying on his own behalf in a harmful manner. Dr. Glass testified that, over the years, Cornelius had attempted suicide numerous times and that he believed the trial would be an effective way to end his life. Dr. Glass further testified that, without medication, Cornelius might "lose control" while testifying at trial.
At the end of the hearing, the trial court ruled that Cornelius was competent to stand trial. In making its ruling, the trial court stated it gave greater weight to the testimony of Dr. Axelrad:
I've looked at the doctors' reports. I've listened to their testimony. Dr. Axelrad's assessment is clear; without any hesitation, he is-the defendant is competent in this matter. And I-I'm not going to diminish anybody, but Dr. Axelrad did all the heavy lifting in this. He administered the tests.
The trial court explained that its ruling was based primarily on Dr. Axelrad's finding that Cornelius had sufficient residual functional capacity:
But to me, the key in this is the phrase, residual functional capacity. And what Dr. Axelrad was saying that in spite of having a mental disease, a schizoaffective disorder, that this defendant has the residual functional capacity for competency which is part just due to intellect and perhaps some determination in the face of probably difficult odds, but at the same time he's overcome. I do find him to be competent.
And the trial court noted that he took into account Cornelius's refusal to take medication:
He can be better performing if he takes his medications and more able to help himself, and particularly if he were to make a determination regarding testimony.... I do not think that the law is that we allow someone to direct the trial based upon their refusal or lack of refusal to take medication when that medication can do nothing but help; and in this case, he does not reach the level of incompetency.[6]
On appeal, Cornelius argues that the trial court abused its discretion by failing to give greater weight to the testimony of Dr. Glass. But as the factfinder, it was the trial court's prerogative to make credibility determinations and to elect to give greater weight to the testimony of Dr. Axelrad. We overrule Cornelius's eighth issue.
Conclusion
We affirm the trial court's judgment.

Tex. Penal Code § 19.03(a)(7).

Most of Yancey's cousins lived in Abilene.

Yancey's body was not found until 11:00 a.m.

Section 19.02(b)(1), in turn, provides that a person commits murder if he "intentionally or knowingly causes the death of an individual...." Tex. Penal Code § 19.02(b)(1).

Tyler's testimony concerns the conditions of his probation and whom he lived with when he was in high school; Cornelius's testimony concerns whether he told his girlfriend, Ana, to lie about when he returned home the night of the murder; and Eddie's testimony concerns whether he and Cornelius ever discussed the case.

When the trial resumed, defense counsel affirmed that Cornelius was taking all of his medication.