**Opinion issued September 7, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00399-CR

———————————

**CHARLES EDWARD JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Case No. 19,199**

---

## MEMORANDUM OPINION

The trial court found appellant, Charles Edward Johnson, guilty of the felony

offense of aggravated assault,[1] and the trial court assessed his punishment at

---

[1]     *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(1).

confinement for fifteen years. In his sole issue, appellant contends that the trial court erred in not admitting certain defensive evidence.

We affirm.

## Background

The complainant, Charlene Hope Atkinson, testified that appellant is her nephew and appellant's mother, Benita Atkinson, is her sister. In October 2020, the complainant lived in a house at 300 Barbee Street, Brenham, Washington County, Texas, which was Benita's house. Appellant lived on the same property in his sport utility vehicle ("SUV"). According to the complainant, Benita did not want appellant living in the home, and the complainant did not have any knowledge of an arrangement between Benita and appellant that would let appellant stay outside the home in his SUV. Appellant would park his SUV next to the driveway in front of the house.

The complainant further testified that to get power to his SUV, appellant used the complainant's extension cord, which was connected to the house in the utility room and ran to his SUV. Appellant also used the complainant's water hose to supply him with water. He did not pay rent or pay a portion of the utilities for the house.

At some point, in October 2020, while appellant was staying in his SUV at the house, the complainant went outside and used her poultry shears to cut her water

2

hose and her extension cord that were running to appellant's SUV. The complainant did so "to make a point" and to "save a little money" because she was "tired of" paying the bills. Appellant was inside his SUV when the complainant cut the water hose and the extension cord. The complainant was not close to the SUV. After the complainant cut the water hose and extension cord, appellant started saying "some profanities." The complainant did not respond to anything appellant said.

The complainant then started walking back to the front door of the house, still holding the shears, and appellant got out of the SUV and followed her, walking "very harshly" toward her. The complainant stated that she tried to go back inside the house because appellant was "very violent" and she "needed to get out of [D]odge." When the complainant was halfway inside the door, she kind of fell down to her knees, and appellant "physically made contact with" her. Appellant hit the complainant on the left side of her face next to her eye with his fist. Her glasses broke "into [her] face." The complainant then "blacked out" and was unconscious. When she woke up, she "was in blood." There was blood on the floor, and her hair felt wet. The complainant crawled to her cellular telephone and called for emergency assistance.

As to her injuries, the complainant testified that appellant broke two bones around her eye and tore her right ear off. Appellant also stomped on her back and broke the complainant's teeth. The complainant lost a "bit of hearing" in her ear,

3

and it had to be "stitch[ed] . . . back" on "all the way." She had surgery to repair her eye, and her facial bones were replaced with titanium plates to hold her eye in place.

The complainant stated that she never threatened appellant with the shears, and she never tried to poke him or cut him with them. She never "brandish[ed] them toward" appellant, and she never told appellant that she was going to cut him or shoot him. She never went toward appellant, and she never threatened to hurt him. The complainant did not touch appellant's SUV. She also did not say anything to appellant when she cut the extension cord or the water hose, and she did not say anything to appellant after she did it. The complainant was walking away from appellant when she was hit by appellant in the face. She did not recall "fighting back" after she was hit.

Brenham Police Department Officer A. Guerra testified that on October 20, 2020, she responded to a call for emergency assistance at 300 Barbee Street. When Guerra arrived, she saw a single-story home and an SUV parked "on the side." She went inside the home and saw the complainant with extensive injuries to her face. Guerra noted that part of the complainant's ear had been separated from her head, and it looked like "a piece of her scalp was hanging off of her head." The complainant also had bruising on her right shoulder.

When Officer Guerra went back outside the home, she saw appellant walking down the street toward her. Appellant was on his cellular telephone. When Guerra

4

asked appellant what had happened, he stated that the complainant "had cut the extension cord that was providing power to his [SUV]" and the complainant had "pointed the [shears] at him and threatened him." According to appellant, he then went into "fight or flight" mentality and "flipped out" because he felt threatened. (Internal quotations omitted.) Appellant told Guerra that he punched the complainant multiple times. Guerra noted that she saw a "cut extension cord" at the property, which was "coming from the house and . . . was going into" appellant's SUV.

Officer Guerra further testified that she also spoke to the complainant October 20, 2020, and the complainant stated that she had "cut the extension cord because she ha[d] the right to because she pa[id] all the bills." After she cut the extension cord, appellant "started cussing at her," and she walked toward the house. According to the complainant, appellant "followed her and started hitting her from behind, and she lost consciousness." The complainant reported that appellant had "struck her multiple times." When Guerra asked the complainant "if she had ever pointed the [shears] at [appellant] or threatened him," the complainant said "no, she didn't point the [shears] at him, and she said no, she didn't threaten him." The complainant's injuries were consistent with appellant punching her.

Melissa Fleeting, a forensic nurse at a hospital in Temple, Texas, testified that she was trained to care for people who had been assaulted. On October 20, 2020,

5

while working, she evaluated the complainant at the hospital. As to the complainant's injuries, Fleeting stated that the complainant had an ear laceration and bruising around her eye. She also had multiple bruises on her collarbone, chest, lower back, and hands. She had abrasions on her arms. The complainant had a subconjunctival hemorrhage, meaning that her eye was completely bruised or reddened. And the complainant had an orbital wall fracture and an orbital floor fracture. A person with an orbital wall fracture or an orbital floor fracture has "a high chance of losing [an] eye" or "having disfigurement." That type of injury can cause "permanent loss" of an eye. A person usually suffers an orbital floor fracture when something hits the eye with a lot of force, such as a baseball or a fist.

According to Fleeting, the complainant reported that "she was in the process of going into her house," when appellant "walked up to her[] [and] punched her in the face." She then fell down and did not remembered what happened after that. Fleeting asked the complainant if she was unconscious, and the complainant confirmed that she was unconscious. Fleeting did not see any evidence that suggested that the complainant had hit anyone—the complainant did not have any "busted knuckles or broken fingers."

Fleeting testified that the complainant later had surgery to "put in a titanium mesh to hold all of the fractured pieces" around her eye together and to "hold her eye up."

6

Appellant testified that he previously lived at 300 Barbee Street "[o]n and off for five years." Benita, his mother, owned the home. Benita had given appellant permission to stay on the property. On October 20, 2020, he was living in his SUV at 300 Barbee Street. The SUV was not operational, and it was parked in the driveway. Appellant stated that he lived in the SUV because he and the complainant did not get along.

Appellant further testified that he had an extension cord that ran from the "washroom on the side of the house" to his SUV so that he had electricity in the SUV. Appellant also had a water hose that was "plugged into" a waterspout in the front of the house that ran to his SUV. Appellant received electricity and water from the house, but he was not contributing to paying for those things because Benita told him not to do so.

According to appellant, on October 20, 2020, while appellant was watching a show on his cellular telephone, the complainant came out of the house and cut the extension cord. The complainant "looked like she had been drinking," and "[s]he was belligerent." She was "acting erratic" and angry. Appellant then got out of his SUV and asked the complainant "what she was doing." Appellant told the complainant that he was "fixing to call [his] mother" because she would not "leave [him] alone," and the complainant "started walking back toward[] the house," "saying things." Appellant called Benita, while the complainant was "pacing in the

7

yard" with the shears in her hand and smoking. When Benita told appellant to give the complainant the cellular telephone, the complainant "got threatening" and "moved toward[] [appellant] with the [shears]." The complainant had the shears "on her side" and was "moving in a threatening manner." "Her posture started to change as she was advancing toward[] [appellant] saying her threats." The complainant was in "an attack position," and appellant "took it as a threat, a real threat." Appellant stated that the shears the complainant had in her hand were very sharp, and he felt that the complainant was going to "try to attack [him] and try to stab [him] to death." The complainant told appellant that "she would stab [him] and finish the job that another tried to do."

Appellant further testified that when the complainant "threatened to also grab her gun," he "struck her three times." He punched her in the side of her face with a closed fist and slapped her with an open hand on the side of her face. After appellant slapped the complainant, she fell down. Appellant hit the complainant multiple times because he thought she was going to get her firearm. After appellant "stepped on" the complainant's face, "her whole body went limp." Appellant stated that he was "trying to incapacitate an aggressor." At that point, the complainant had dropped the shears, and appellant walked away while the complainant "laid there" unconscious.

Appellant noted that he had previously been stabbed and the complainant that day reminded him of the person who had previously stabbed him. He believed that he was going to be "stabbed or cut" by the complainant. He was afraid for his life.

Appellant also testified that he caused the complainant's injuries, and he knew that he had punched her, slapped her, and stomped on her face. Appellant further stated that the complainant had "made it all the way back to [the] door" to the house before appellant made any physical contact with her, and he got out of his SUV and followed her back toward the house. The shears hit the complainant's face, which is how her ear was cut. Appellant did not see the complainant's firearm that day.

Benita testified that appellant is her son and the complainant is her sister and appellant's aunt. Benita stated that the complainant was not a truthful person. Benita testified that she owned the home at 300 Barbee Street.

According to Benita, on October 20, 2020, appellant and the complainant were both living at 300 Barbee Street. The complainant lived in the house, and appellant lived in his SUV in the driveway. Benita was not at the home on October 20, 2020, but she was "on the phone with [appellant] when [the incident] took place." Appellant had called her that day, and she heard a confrontation between appellant and the complainant.

**Right to Present Complete Defense**

In his sole issue, appellant argues that the trial court erred in not admitting certain defensive evidence because the trial court's rulings prevented appellant from "presenting a complete defense." *See* U.S. CONST. amends. VI, XIV.

A criminal defendant's constitutional right to a meaningful opportunity to present a complete defense is grounded in the Fourteenth Amendment's Due Process Clause and the Sixth Amendment. *See* U.S. CONST. amends. VI, XIV; *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009). However, "[e]rroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional right[] to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002); *see also Harper v. State*, 540 S.W.3d 223, 234 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). A trial court's exclusion of evidence may rise to the level of a constitutional violation if the ruling excludes otherwise relevant and reliable evidence which "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (internal quotations omitted). The fact that a defendant was unable to present his case to the extent and in the form he desired does not rise to constitutional error if he was not prevented from presenting the substance of his defense to the trier of fact. *See Potier*, 68 S.W.3d at 666; *see also Harris v. State*, 152 S.W.3d 786, 794 (Tex. App.—Houston [1st Dist.] 2004, pet.

ref'd) ("A defendant's right to present relevant evidence is not unlimited, but rather subject to reasonable restrictions." (internal quotations omitted)).

Appellant complains that the trial court erroneously sustained the State's objections to certain portions of his testimony and Benita's testimony, and the trial court erroneously sustained the State's objections to Defendant's Exhibits 2, 3, and 4 and did not admit them into evidence. Specifically, appellant complains about the following rulings by the trial court.

Ruling 1:

| [Appellant's counsel]: | . . . Where did [the complainant] come from? |
|---|---|
| [Appellant]: | She came from the front door. |
| [Appellant's counsel]: | And where did she go? |
| [Appellant]: | She went into the middle, up into the driveway and close toward[] the door, and cut my power cord, complaining that . . . I didn't take the trash out. |
| [Appellant's counsel]: | Okay. What else was she saying to you? |
| [Appellant]: | So she was telling me -- |
| [State]: | Judge, I'm going to object to hearsay as to what [the complainant] said to him. She has testified and been subject to |

|  |  |
|---|---|
|  | cross-examination, so anything he says that she said is hearsay. |
| [Appellant's counsel]: | Judge, the witness has testified to what she said and what he said, and it's only fair that he gets to say his side of the story. I mean, it's not hearsay; she's subject to cross-examination for anything that he said -- or she said. |

. . . .

|  |  |
|---|---|
| The Court: | I'm sustaining his objection as to hearsay, yes. |

Ruling 2:

|  |  |
|---|---|
| [Appellant's counsel]: | Okay. And so you call [Benita]. Did she get on the phone? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Did you explain to her what was going on? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | All right. At that point where was [the complainant]? Where was she? |
| [Appellant]: | She was standing, pacing in the yard with the -- she had the [shears] in her hand. She was smoking a cigarette. We're not allowed to smoke in the house. |

| | |
|---|---|
| [Appellant's counsel]: | Okay. And then what happened at that point? |
| [Appellant]: | My mother told me to give her the phone, so I walked up to give her the phone, and she was like: I don't want to talk to her. I run this. I -- |
| [State]: | Objection, Your Honor; it's still hearsay. |
| [Appellant's counsel]: | Again, Your Honor, she was allowed to testify to what happened. |
| The Court: | Sustained. |

Ruling 3:

| | |
|---|---|
| [Appellant's counsel]: | . . . I'm going to show you what we have marked as Defendant's Exhibit 3, 2, and 4. Do you see those numbers there? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Okay. Do you recognize what these documents are? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | These are photographs; is that correct? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | And these are photographs that were taken of you; is that correct? |

| | |
|---|---|
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Did you take these photographs? |
| [Appellant]: | No, sir. |
| [Appellant's counsel]: | You were present when they were taken, obviously? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Because they are of you? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Do these photographs accurately and correctly depict the scene as it existed when these photographs were taken? |
| [Appellant]: | Yes, sir. |
| [Appellant's counsel]: | Your Honor, I would offer Defendant's Exhibits 2, 3, and 4 into evidence. |
| [State]: | Judge, I'm going to object to relevance. These show injuries from, presumably, [a] previous assault and have no bearing on our case. |
| [Appellant's counsel]: | And Judge, I realize that they are from a different case, but we have spent quite some time discussing that case. There was no objection to that case. I believe it's relevant to the fact |

that [appellant's] in a very unique position of knowing what being assaulted by a knife is, and I believe these pictures are a good depiction of the fear that this man has discussed and the concerns that he had, like I'm quite sure no one else in this courtroom has ever experienced, and that's what I would offer them for.

The Court: The objection is sustained. I'm not going to admit them.

Ruling 4:

[Appellant's counsel]: . . . At that time on October 20, there was an incident that occurred with [the complainant] and [appellant]; is that correct?

[Benita]: That is correct.

[Appellant's counsel]: . . . Were you there [on] . . . the[] day that that happened?

[Benita]: I was not there, but I was on the phone with [appellant] when it took place.

[Appellant's counsel]: Okay. But you were not there; is that correct?

[Benita]: Not physically, no sir.

[Appellant's counsel]: Okay. Now, on that day did you get a phone call?

15

| | |
|---|---|
| [Benita]: | Yes sir. |
| [Appellant's counsel]: | From [appellant]? |
| [Benita]: | Yes, sir. |
| [Appellant's counsel]: | And when you got the phone call, what was he -- why did he call you? |
| [Benita]: | He called me because he said that [the complainant] was outside -- |
| [State]: | Objection, Your Honor; it's hearsay. What he told her is a statement outside -- |
| [Appellant's counsel]: | Judge, this is all in evidence and this is an eyewitness to the event. |
| [State]: | And in that case it's just repetitious. |
| The Court: | I'm going to have to sustain it as to hearsay as to what he told her. |

Ruling 5:

| | |
|---|---|
| [Appellant's counsel]: | You were on the phone with [appellant]? |
| [Benita]: | Yes, sir. |
| [Appellant's counsel]: | Did you . . . hear a confrontation? |
| [Benita]: | Yes, sir. |

16

| | |
|---|---|
| [Appellant's counsel]: | Could you tell who the confrontation was between? |
| [Benita]: | Yes, sir. |
| [Appellant's counsel]: | How could you tell who the confrontation was between? |
| [Benita]: | I have known [the complainant] my whole life and I've known [appellant] his whole life and I know their voices. |
| [Appellant's counsel]: | You heard their voices? |
| [Benita]: | Yes, sir. |
| [Appellant's counsel]: | Okay. And from what you heard, could you describe to the [c]ourt what you heard? |
| [Benita]: | [Appellant] was asking her not to keep coming at him. |
| [State]: | Objection, Your Honor; hearsay, "what did he say." |
| [Appellant's counsel]: | Judge, this is a witness. |
| The Court: | Sustained. It's a telephone call. |

To preserve a complaint for appellate review, a defendant must show that he first presented to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling. *See* TEX. R. APP. P. 33.1(a); *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003). Texas Rule of Appellate Procedure 33.1 requires that a

17

defendant have "stated the grounds for the ruling that [he] sought from the trial court with sufficient specificity to make the trial court aware of [his] complaint." TEX. R. APP. P. 33.1(a)(1)(A); *cf. Carter v. State*, No. 01-16-00799-CR, 2017 WL 4682187, at *2–3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2017, pet. ref'd) (mem. op., not designated for publication) (Confrontation Clause complaint not preserved where defendant did not refer to Confrontation Clause as basis for admitting exhibit into evidence or as basis for questioning complainant about it). The rationale of rule 33.1 is that if a complaint is raised before the trial court as soon as error becomes foreseeable, it may be addressed and the error possibly corrected or avoided. *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009); *see also Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (it is imperative to avoid forfeiting complaint on appeal that defendant "let the trial [court] know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the [trial court] to understand him at a time when the [court] is in the proper position to do something about it" (internal quotations omitted)). Even claims involving constitutional error must be preserved or they are waived. *See Reyna v. State*, 168 S.W.3d 173, 176–79 (Tex. Crim. App. 2005) (stating failure to present particular argument to trial court in support of admission of excluded evidence waives that argument for appeal); *Holland v. State*, 802 S.W.2d 696, 699–700 (Tex. Crim. App. 1991); *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990); *Harrell v. State*, No.

18

14-08-00028-CR, 2009 WL 5818564, at *6 (Tex. App.—Houston [14th Dist.] Sept. 1, 2009, pet. ref'd) (mem. op., not designated for publication) (defendant waived argument exclusion of hearsay testimony violated defendant's right to present complete defense where defendant did not first present argument to trial court).

Here, appellant never informed the trial court that his constitutional right to present a complete defense had been violated by the trial court's rulings sustaining the State's objections nor did he ever object during trial that the trial court's rulings were depriving him of his constitutional right to present a complete defense.[2] *See Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018) (explaining to preserve argument that exclusion of defensive evidence violates constitutional principles, defendant must state grounds for ruling sought with sufficient specificity to make trial court aware of constitutional grounds); *Saunders v. State*, No. 03-19-00191-CR, 2021 WL 1031343, at *4 (Tex. App.—Austin Mar. 18, 2021, no pet.) (mem. op., not designated) ("While the right to present a complete defense is rooted in constitutional protections, . . . even constitutional rights may be waived . . . ."). Because appellant did not argue at trial that the trial court's rulings denying the admission of certain defensive evidence were precluding appellant from "presenting a complete defense," we hold that he did not preserve his sole issue on

---

[2] A defendant also fails to preserve error when the contention urged on appeal does not match with the specific complaint made in the trial court. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009).

appeal for our review. *See Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) (recognizing deprivation of meaningful opportunity to present complete defense is right subject to forfeiture); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (complaint on appeal that defendant was denied right to present defense and right to due process or course of law did not correspond to objection made at trial, and thus defendant did not preserve complaint); *Saunders,* 2021 WL 1031343, at *4 ("At trial, [defendant never] . . . objected to [the evidence's] exclusion on the ground that his constitutional right to present a complete defense was compromised by the exclusion of the evidence. Because [defendant] did not articulate that his right to present a complete defense supported (or required) the admission of the evidence . . . , the trial court never had the opportunity to rule on this rationale."); *Houston v. State*, No. 05-11-00016-CR, 2012 WL 2511588, at *1 (Tex. App.—Dallas July 2, 2012, pet. ref'd) (mem. op., not designated for publication) (defendant did not preserve complaint trial court's rulings sustaining State's objection deprived him of right to present complete defense where defendant did not object or advise trial court that his constitutional right to present complete defense had been violated); *Menjivar v. State*, No. 01-10-00132-CR, 2011 WL 2183735, at *1 (Tex. App.—Houston [1st Dist.] June 2, 2011, no pet.) (mem. op., not designated for publication) (defendant waived argument that trial court violated constitutional right to present complete defense because State's relevancy objections

were countered with arguments based on rules of evidence, not arguments based on violation of defendant's constitutional right to present complete defense).

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).